**LOUISIANA NEVADA TRANSIT COMPANY**

v.

**MARATHON OIL COMPANY.**

Civ. A. No. 89–2824.

United States District Court,
W.D. Louisiana,
Shreveport Division.

July 17, 1991.

Thomas Wyatt and Scott Sinclair, Hargrove, Guyton, Ramey & Barlow, Shreveport, La., for plaintiff.

Robert Roberts, David Matlock and Joseph Wiley, Blanchard, Walker, O'Quin & Roberts, Shreveport, La., for defendant.

## MEMORANDUM RULING

STAGG, District Judge.

The parties have filed cross motions for summary judgment. Louisiana Nevada Transit ("LNT") seeks to permanently enjoin Marathon Oil Company ("Marathon") from terminating the Gas Sales Agreement. Marathon's counterclaim asks for a declaratory judgment that the Gas Sales Agreement terminated on January 4, 1990, by exercise of an option to terminate. Marathon's motion for summary judgment does not address its other asserted grounds for termination of the contract, nor does it address damages for wrongfully obtained preliminary injunctive relief. For the reasons given below, LNT's motion for summary judgment is DENIED, and Marathon's motion for partial summary judgment is GRANTED.

### I. THE FACTS

On July 1, 1940, oil and gas producers in the Cotton Valley Field, located in northern Louisiana and southern Arkansas, entered into the Cotton Valley Unitization and Pressure Maintenance Agreement. This Agreement created a large, unitized area for production of gas and constituent liquid hydrocarbons and established the Cotton Valley Operators Committee ("CVOC") to act on behalf of the owners of oil and gas leases in the unitized area.

Prior to unitization, LNT, which operates an interstate gas transmission system, purchased gas from the Cotton Valley Field pursuant to a 1938 contract with Oliphant Oil Corporation. The Gas Sales Agreement, dated October 24, 1940, between CVOC and LNT, cancelled and superseded the Oliphant Contract. As subsequently amended, this 1940 Contract (the "Contract") is the subject of this lawsuit.

On April 9, 1976, CVOC and Marathon signed an operating contract which made Marathon the unit operator of the CVOC properties. This agreement gave Marathon the right to act as agent for the lease owners.

The final amendment to the Contract on the issues of quantity and termination are as follows:

Article 1: Buyer agrees to buy from Seller the first 10 million cubic feet of gas per calendar month for its gas requirements for so long a period as buyer shall have a market for such amount. This provision shall not, however, be construed as a minimum take provision, that is to say, the Buyer shall be obligated to pay for only such as it actually receives, subject, however, to the provisions of the paragraph immediately following.

Should Buyer fail, neglect, or refuse to take and pay for, or pay for if not taken, at least 30 million cubic feet of gas from seller during any consecutive 90–day period during the life of this contract, then the Seller may, at its option, elect to terminate this contract by giving to Buyer 60 days' notice, in writing, of its intention so to do.

From March through September of 1989, there were twenty-two consecutive 90–day periods in which LNT failed to take and pay for the minimum requirements under the contract. In fact, there were numerous consecutive days when LNT took no Cotton Valley gas at all. More specifically, for 90–day periods ending on June 5–17, 1989 ("the June period") and September 14–22, 1989 ("the September period"), LNT failed to take and pay for, or pay for if not taken, at least 30 MMCF of gas. By letter dated November 3, 1989, Marathon exercised CVOC's option to terminate the Contract, stating that such termination would become effective on January 4, 1991.

On November 14, 1990, LNT attempted to pay for the gas not taken during both the June and September periods by including such amount with the payment for gas taken during September. Although Marathon attempted to stop the check before it went through its bank, it was unable to do so and, instead, sent LNT a refund for the amount in excess of that actually delivered.

On December 8, 1989, LNT commenced this action seeking a permanent injunction enjoining Marathon from terminating the Contract. On December 11, 1989, LNT moved the court for a temporary restraining order and a preliminary injunction to prevent Marathon from terminating deliveries under the Contract during the pendency of this action. Despite being given notice and an opportunity for a hearing, Marathon elected not to oppose that motion. On December 18, 1989, this court signed an order prohibiting Marathon from terminating deliveries under the Contract, until the disposition of LNT's motion for permanent injunction. Along with its answer to the complaint, Marathon filed a counterclaim against LNT, seeking a declaratory judgment that the Contract terminated and seeking damages for wrongful issuance of the injunction order of December 18, 1989.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Both parties agree that the underlying facts are undisputed. The dispute is essentially whether or not an option ever arose for CVOC to terminate the Contract and, if so, whether Marathon properly and timely exercised this option. The court need only interpret the disputed provisions of the Contract and to determine the consequences of the factual circumstances as they relate to the contract thus interpreted. Summary judgment is, therefore, appropriate.

## III. MARATHON'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Although jurisdiction in this case is based on diversity, federal law controls whether a court may properly render a declaratory judgment. *National Railroad Passenger Corporation v. Consolidated Rail Corporation*, 670 F.Supp. 424, 429 n. 7 (D.D.C.1987), *vacated on other grounds*, 892 F.2d 1066 (D.C.Cir.1990). Neverthe-

less, Louisiana law will apply to the underlying substantive issues.

Under the Declaratory Judgment Act, 28 U.S.C. § 2201, declaratory relief is appropriate where there is a substantial controversy of sufficient immediacy and reality between parties having adverse legal interests. *Maryland Casualty Company v. Pacific Coal & Oil Company*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The court finds that a substantial controversy exists between these parties which is both immediate and real.

■ Marathon contends that, based upon the plain language of Article 1 of the Contract, an option to terminate the Contract arose when LNT failed to take and pay for, or pay for if not taken, the minimum requirement under the Contract. Both parties agree that Article 1 creates no obligation on the part of LNT other than to pay for gas taken during the 90–day period. In other words, if LNT failed to take gas during the 90–day period, it was not required to pay for the gas; such payment was merely optional should LNT want the Contract to continue in force.

LNT first contends that the total deficiencies in its "take" for the disputed 90–day period amounted to less than 1 per cent of the total takes during 1989 and, thus, does not constitute a breach significant enough to warrant cancellation of the contract, citing *Publicker Chemical Corporation v. Belcher Oil Company*, 792 F.2d 482 (5th Cir.1986). This argument is flawed for several reasons. First, as LNT readily admits, this is not a case involving a breach of contract. By failing to take the 30 MMCF during a consecutive 90–day period, LNT did not breach any obligation it owed under the Contract. Second, *Publicker* involved a broad and generalized termination clause which provided that "in the event either party shall default in the performance of an obligation," the contract would terminate. The United States Court of Appeals for the Fifth Circuit in that case found that this language referred only to the breach of a primary obligation. The Court recognized that if the parties had intended any breach whatsoever of both

primary and ancillary obligations to terminate the contract, they could have so specified. In this case, the parties have specified exactly what will create the option to terminate; there is no ambiguous language concerning whether the parties considered an amount slightly less than 30 MMCF to be enough to terminate the Contract. Furthermore, courts have repeatedly stated that termination clauses as agreed upon by the parties shall be enforced as written. *Bonanza International v. Restaurant Management Consultants*, 625 F.Supp. 1431, 1440 (E.D.La.1986); *Inabnet v. Pan American Life Insurance Company*, 267 So.2d 774 (La.App. 2d Cir.1972). Thus, if LNT failed to take and pay for, or pay for if not taken, the minimum requirements under the Contract, an option to terminate arose even if the deficiency was *de minimis.*

Second, LNT argues that no option to terminate ever arose. LNT explains that in order for the option to arise, two things must happen. First, LNT must fail to take and pay for at least 30 MMCF of gas during a consecutive 90–day period; second, if LNT fails to take the minimum gas requirement, it must fail to pay for gas not taken. Because, according to LNT, *both* events must occur, the date on which the later payment is due is the date on which the option arises. Because LNT is not required to pay for gas taken during a 90–day period until the 15th day following the month after the 90–day period ends, LNT argues that its November 14, 1989, payment was timely as to the September period.

The court acknowledges that the parties have arguably modified Article 7 of the Contract which stated the billing and payment provisions under the Contract. By its very terms, however, Article 7 applies only to billing for "the amount of gas delivered ... by seller during the preceding billing month and the amount due therefor." Pursuant to Article 7, LNT agreed to pay CVOC "on or before the 20th day of each calendar month for all gas delivered; during the preceding billing month." Notwithstanding the explicit language of the Con-

tract, the parties adopted a billing month that was based on a calendar month and, for approximately seven years, adopted the following process: LNT rendered a volume statement to Marathon by the 15th day of the month following the billing month and rendered payment to Marathon by the 15th day of the second month following the billing month. This practice, however, can only modify the Contract as it applies to gas *delivered* under the contract. The billing and payment provisions in Article 7, by their express terms, apply only to payments *owed* by LNT for gas actually taken, not to any *optional* payment for gas *not taken*. Because LNT had never made a payment under Article 1 for gas not taken, no practice could have developed between the parties concerning when payment for gas not taken would be made.

Thus, the court must go back to the express language of Article 1 which requires that LNT take and pay for, or pay for if not taken, at least 30 MMCF of gas during a consecutive 90–day period. LNT admits it did not take the minimum gas, nor did it pay for the minimum gas during the 90–day period. The Contract continues in force if LNT takes the minimum gas under the Contract during the 90–day period and, yet, does not pay for the gas during that same 90–day period. This result is mandated by the express language of the Contract which obliges LNT to pay for gas delivered and establishes a date for payment beyond the 90–day period. While the Contract specifically provides that LNT is obligated to pay for gas taken, LNT is under no obligation to take gas from CVOC. Thus, if LNT fails to take the minimum gas, CVOC does not have the *right* to bill LNT for such deficiency. The court therefore discards LNT's argument that Marathon was under a duty to bill LNT for gas not taken during a 90–day period before an option arose.

■ The court, thus, finds that the option to terminate the Contract for failure to take the minimum requirements under the Contract during the September period arose immediately upon the end of the 90–day period in which LNT failed to take the

gas and failed to pay for the deficiency. The court further finds that Marathon exercised its option to terminate the Contract in a reasonable and timely manner by sending the letter to LNT informing it of its termination and referring to the clause in the Contract under which it was exercising the option.

The court further finds that the option was timely exercised for the June periods as well. LNT first contends that the notice given by Marathon of its exercise of the option to terminate, was not specific enough to include the June period. In its letter dated November 3, 1989, Marathon stated:

> Pursuant to the provisions of Article 1 of the subject contract, as amended, and by virtue of the authority vested in it by the CVOC, Marathon Oil Company hereby notifies you of CVOC's exercise of its option to terminate the subject contract, effective January 4, 1990.

The notice further provided that "the grounds for this action are LNT's failure to take, or to pay for if not taken, a volume of at least 30 MMCF at 16.7 PSIA over *a recent period* of 90 consecutive days." (Emphasis added.) It is the underlined portion of the notice which LNT contends does not include the June period. LNT brings forward a substantial amount of evidence which may tend to show that at the time Marathon sent this letter, it did not know of LNT's failure to take the minimum requirements in the June periods. LNT, however, is misdirecting its energies for proving an understanding of what the notice contained. What is important in determining whether a notice of termination is sufficiently clear to apprise a party of the action is whether the party so apprised understands the scope of the notice. Here, LNT clearly understood the notice to include both September and June periods, as it attempted to make payments for both periods in its November 1989 check.

■ LNT also contends that if an option to terminate did arise for the June periods, Marathon failed to exercise this option timely. The Contract in this case did not specify a time limit for exercise of the options and, therefore, a reasonable

period of time applies. To determine whether an option was exercised in a reasonable period of time, the court must first determine whether LNT suffered any prejudice by the timing of Marathon's letter. LNT has not shown the court any way in which it suffered prejudice other than that Marathon was able to exercise its option to terminate. LNT has not changed its position in reliance on Marathon's inaction. Furthermore, LNT had its own records showing that even at 15.25 PSIA, it had failed to take the minimum requirement under the Contract and, therefore, could have expedited the process by requiring Marathon to decide whether it was going to exercise its option. Even though Marathon's November 3 letter came almost five months after the last 90–day period in June, the court finds that the option was exercised in a timely manner.

In a final effort to salvage the Contract, LNT argues equity to the court, contending that, because Marathon billed LNT at a pressure base of 15.025 PSIA, rather than at 16.7 PSIA as called for in the Contract, LNT did not know that it failed to take the required minimum under the Contract. Given the long and continuous use of the 15.025 pressure base, LNT argues that equity dictates that Marathon should have given LNT notice of its failure to take the minimum requirement before attempting to terminate the Contract on that basis. Furthermore, LNT argues that it is not unreasonable to expect Marathon either to bill LNT for gas not taken or at least to put LNT on notice before attempting to terminate the Contract. LNT has kept alive the Contract for many years by insisting on strict compliance with certain parts of the Contract; yet, it now argues that the court, in consideration of equity, should step outside the literal terms of the Contract and allow LNT to ignore specific provisions. This the court cannot do. Because LNT was not obligated to pay for gas not taken, Marathon had no right to bill LNT for any deficiencies. Furthermore, the court is not faced with parties of unequal sophistication and facilities. LNT had means available to it to discover whether it was in compliance with the Contract and it did not avail itself of those means. Furthermore, by its own admission, on three instances, a 90–day period ended in which LNT took less than 30 MMCF, even at a pressure base of 15.025 PSIA. LNT knew the terms of the Contract and should have known the consequences of such a failure.

## IV. LOUISIANA NEVADA TRANSIT'S MOTION FOR SUMMARY JUDGMENT

The only claim asserted in LNT's complaint is a claim for permanent injunction prohibiting Marathon from terminating deliveries under the Contract. Under federal law, in order to obtain a permanent injunction, LNT must establish each of the following elements:

1. That LNT succeeded on the merits;
2. That LNT has no adequate remedy at law;
3. That the granting of injunctive relief will not be adverse to the public interest; and
4. That the balance of equities support a permanent injunction.

*Lewis v. S.S. Baune*, 534 F.2d 1115, 1124 (5th Cir.1976). LNT's complaint must fail, as the court finds that LNT has not succeeded on the merits.

THUS DONE AND SIGNED at Shreveport, Louisiana, this 17th day of July, 1991.