PROVIDENCE JOURNAL
COMPANY, Plaintiff,

v.

The TRAVELERS INDEMNITY COMPANY, American Home Assurance Company, First State Insurance Company, and The American Insurance Company, Defendants.

C.A. No. 92–0339L.

United States District Court,
D. Rhode Island.

Sept. 5, 1996.

Deming E. Sherman, Edwards & Angell, Rosemary Healey, Powers, Kinder & Keeney, Providence, RI, for plaintiff.

Mark C. Hadden, Gidley, Sarli & Marusak, Providence, RI, Bret A. Fausett, John A. Nadas, Choate, Hall & Stewart, Boston, MA, for Travelers Indemnity.

Kenneth P. Borden, Higgins, Cavanagh & Cooney, Providence, RI, Joanne F. Poles, Lord Day & Lord, Barrett Smith, New York City, Howard P. Epstein, Schulte Roth & Zabel, New York City, for American Home Assurance.

Thomas C. Angelone, Hodosh, Spinella & Angelone, Providence, RI, for First State Insurance Co.

James T. Murphy, Hanson, Curran, Parks & Whitman, Providence, RI, Charles K. Meuse, Caron & Fitzgerald, Rutherford, NJ, for American Insurance Co.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This case involves the Providence Journal Company's (the "Journal") claim of insurance coverage for liabilities and costs of defense arising from a lawsuit brought against the Journal and others by the United States pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The Journal has brought a declaratory judg-

ment and breach of contract action in which it claims that defendant Travelers Indemnity Company ("Travelers") is required to defend it in the government's CERCLA action in accordance with several comprehensive general liability insurance policies. Similarly, the Journal contends that Travelers and the other defendants in this case must indemnify it against any liabilities arising from the CERCLA litigation, as required by various policies of insurance issued by the defendants to the Journal.

This matter is before the Court on the motions of defendant First State Insurance Company ("First State") and defendant Travelers for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, both First State's and Traveler's motions for summary judgment are granted.

## I. Facts

The following facts are undisputed, except as noted. On October 26, 1990, the United States filed suit under CERCLA against several individuals and entities, including the Journal, to recover costs incurred in cleaning up the Davis Liquid Waste Site in Smithfield, Rhode Island (the "Davis Site"). In its complaint, the government alleged that from 1975 to 1978 thousands of gallons of liquid waste containing hazardous substances were disposed of on land owned and operated by William and Eleanor Davis in Smithfield. The United States claimed that the Journal was strictly liable under § 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), as a person "who by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances which were disposed of at the Site."

The Journal, a Rhode Island corporation, admits that in the ordinary course of its business from 1976 to 1978 it generated liquid wastes which were collected in 55 gallon drums. The Journal has at all times, however, vigorously denied the government's claim that its wastes were disposed of at the Davis Site. According to the Journal, during the period in question, its waste ink was hauled away by Cannons Engineering Corporation ("Cannons") for incineration at Cannons'

waste facility in Bridgewater, Massachusetts (the "Bridgewater Facility"). Therefore, the Journal contends that its waste could not have been released at the Davis Site.

The Journal has offered the affidavit of Terrence Ryan, the Journal's building superintendent from 1969 to 1979, who states that at that time he was the individual responsible for the disposal of the Journal's wastes. Ryan states that he selected Cannons to transport and incinerate the Journal's waste ink at the Bridgewater Facility. According to Ryan, neither he nor any other individual at the Journal intended wastes to be disposed of at any location other than the Bridgewater Facility. In support of its position, the Journal has also tendered numerous invoices for the pick-up of drums of waste by Cannons. From October 1975 through January 1979, the Journal used Cannons to ship at least 256 drums of liquid waste on at least 17 different occasions.

The Journal concedes, however, that the undisputed deposition testimony of William Davis taken on December 14, 1983 was that barrels of liquid waste marked with the name of the Journal were brought to his land in Smithfield. The Journal admits that it has no evidence to the contrary, and that for purposes of this litigation the fact that its wastes were found at the Davis Site is undisputed. Therefore, the Journal argues that its wastes must have been diverted to the Davis Site by Cannons.

Soon after it received notice of the government's CERCLA action, the Journal sought insurance coverage from the defendants for potential liabilities and costs arising from this claim. Travelers, the Journal's primary liability insurer, denied that any coverage existed under its policies. Travelers' central contention was that any coverage for liabilities and costs arising from the government's CERCLA action was excluded by the pollution exclusion clause contained in its insurance policies. Similarly, the other defendants, who had issued excess liability coverage to the Journal, maintained that no coverage was available under their policies.

Travelers, a Connecticut corporation, had issued comprehensive general liability insur-

ance policies to the Journal covering the period of July 1, 1976 to July 1, 1986 (the "Travelers Policies") which provided, *inter alia*, $500,000 in liability coverage for damages arising out of bodily injury or property damage caused by an "occurrence".

The Travelers Policies, however, contain a pollution exclusion clause. Under this exclusion, the insurance does not apply:

> [T]o bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant (1) if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any Insured or any person or organization for whose acts or omissions any Insured is liable; or (2) resulting from or contributed to by any condition in violation of or noncompliance with any governmental rule, regulation or law applicable thereto.[1]

The Journal had also obtained excess liability insurance coverage during the relevant period. The American Insurance Company ("American"), a Nebraska corporation, had issued first-tier excess liability policies to the Journal providing $3,000,000 in coverage from April 20, 1976 to August 28, 1979 (the "American Policies"). First State, a Delaware corporation, had issued $7,000,000 in second-tier excess liability insurance to the Journal covering the period of August 28, 1977 to August 28, 1979 (the "First State Policies"). The First State Policies, by their express terms, would be implicated only after the American Policies were fully exhausted. They read:

> It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella Insurers have paid or have been liable to pay the full amount of their respective ultimate net loss liability....[2]

Similarly, American Home Assurance Company ("American Home"), a New York corporation, had provided some second-tier excess liability coverage to the Journal for a period prior to the coverage provided by the First State Policies (the "American Home Policies").

After considerable disagreement on the question of insurance coverage, the Journal brought the current action on June 22, 1992. In Count I, the Journal seeks a declaratory judgment requiring the defendants to indemnify the Journal against any liability arising from the CERCLA action and requiring Travelers, as its primary insurer, to defend the Journal against these claims. Count II is a breach of contract claim based on the alleged failure of the defendants to honor their insurance contracts. Finally, in Count III the Journal claims that Travelers refused in bad faith to perform under its insurance contract, in contravention of R.I.Gen.Laws § 9–1–33.[3]

On June 6, 1993, Travelers moved for summary judgment on the Journal's complaint. Travelers argued that the Journal's claim of insurance coverage was excluded by the pollution exclusion clause contained in the Travelers Policies, since it was a claim for property damage arising out of a pollution discharge either expected or intended by the Journal or organizations for whose acts the Journal was liable.

---

1. The pollution exclusion clauses in the Travelers Policies from July 1, 1976 to July 1, 1981 contain the above language. The Travelers Policies covering July 1, 1981 to July 1, 1983, however, do not contain clause (2) dealing with discharges resulting from a violation of the law. The Travelers Policies covering contamination for the period July 1, 1983 to July 1, 1986, contained an absolute pollution exclusion which stated that the insurance did not apply:

 > To bodily injury or property damage arising: (1) out of any emission, discharge, seepage, release, escape, disposal, storage or transportation of any liquid, solid, gaseous or thermal waste or pollutant, or (2) out of the pollution of

 the environment by the named insured's products or completed operations.

 Nonetheless, as will be discussed below, only the language contained in clause (1) of the Travelers Policies covering July 1, 1976 to July 1, 1983 is relevant. In fact, the Journal has waived its claim for coverage under the Travelers Policies issued for the period July 1, 1983 to July 1, 1986.

2. The "Company" was defined as First State. American was listed as the "Underlying Umbrella Insurer".

3. The Court granted Travelers motion to sever Count III on March 24, 1993.

The Journal filed a cross motion for summary judgment. The Journal contended that the pollution exclusion in the Travelers Policies was not applicable because its sole intention and expectation was that its wastes would be incinerated at the Bridgewater Facility. The Journal also argued that the intent of Cannons and the Davis Site operators was irrelevant, since it was not liable for their acts or omissions. Consequently, the Journal argued that Travelers had a duty to defend and indemnify it against the government's CERCLA action.

On August 12, 1993, after hearing oral arguments on the cross motions for summary judgment, the Court denied both parties' motions. The Court held that at that time genuine issues existed with respect to facts material to the application of the Travelers pollution exclusion clause.

Soon after this Court's denial of the cross motions for summary judgment, the Journal entered into a consent decree with the United States (the "Consent Decree"), thereby settling the Journal's liability with respect to the Davis Site. The Consent Decree was entered by Judge Raymond J. Pettine of this District on February 16, 1995. Pursuant to the Consent Decree the Journal was to pay to the United States the sum of $650,000 plus interest.[4] In consideration of the payment of this sum, the United States promised not to take any action against the Journal pursuant to § 107(a) of CERCLA for reimbursement of costs relating to the Davis Site.

The Consent Decree, however, reserved the right of the United States to take action against the Journal if, prior to completion of the remedial action at the Davis Site:

a. Conditions at the Site, previously unknown to EPA, are discovered, or

b. information, previously unknown to EPA, is received in whole or in part....

Consent Decree at ¶ 10. Similarly, pursuant to the Consent Decree the United States reserved its right to institute proceedings against the Journal if, subsequent to completion of the remedial action at the Davis Site:

a. conditions at the Site, unknown to EPA at the time of Certification of Completion, are discovered, or

b. information, unknown to EPA, is received, in whole or in part ....

Consent Decree at ¶ 11. Finally, the Consent Decree left open the possibility that the government could take action against the Journal based on off-site activities. Consent Decree at ¶ 13.

On September 28, 1995, defendant First State moved for summary judgment arguing that, since the liability of the Journal has been established pursuant to the Consent Decree to be $1,068,142.81,[5] no coverage is available under its excess policy. According to First State, its policy is not implicated until the Journal incurs liability in excess of the $500,000 of coverage under the Travelers Policies and the $3,000,000 of coverage under the American Policies. Therefore, no facts exist under which First State would be obligated to the Journal under its insurance policies.

The Journal contends that it would be inappropriate to dismiss First State from the Journal's declaratory judgment action, since the Consent Decree expressly left open the possibility that the Journal may incur further liability due to unknown conditions at the Davis Site or the Journal's off-site activities. The Journal agrees, however, that any future liability on its part is only hypothetical at this time.

After hearing oral arguments on First State's motion for summary judgment, the Court took the matter under advisement.

Travelers made a second motion for summary judgment on February 28, 1996. Travelers again argues that the pollution exclusion clause in its policy bars the Journal's claim. Essentially, Travelers' arguments mirror those made in its previous motion.

---

4. Ultimately, the Journal paid $24,011.71 of accrued interest on this settlement.

5. The $1,068,142.81 total loss sustained by the Journal in settling the government's CERCLA action represents the $650,000 settlement payment, $24,011.71 in interest on the settlement payment, and $394,131.10 in fees and costs incurred in defending itself against the government's claim.

Travelers relies heavily, however, on two significant developments that have occurred since its prior motion. First, the Journal's liability with respect to the Davis Site has been fixed at $1,068,142.81. The second development is the First Circuit's recent decision in *St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195 (1st Cir.1994), which Travelers believes decides the pollution exclusion issue in its favor.

The Journal argues that no significant changes have occurred since Travelers' first summary judgment motion; Travelers is simply seeking a second bite at the apple. The Journal maintains that its settlement with the United States has no bearing on the issue of whether Travelers' pollution exclusion applies to its claim. Similarly, the Journal contends that the *Warwick Dyeing* decision is irrelevant, since it was based upon an entirely different pollution exclusion clause.

After hearing oral arguments on Travelers' motion for summary judgment, the Court took that matter under advisement. The motions for summary judgment of both First State and Travelers are now in order for decision.

## II. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Consequently, the relevant inquiry is whether a genuine issue of material fact exists. A fact is material if it might affect the outcome of the case under the governing law. *Morrissey v. Boston Five Cents Sav. Bank*, 54 F.3d 27, 31 (1st Cir.1995). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* Under Rule 56, once the moving party has made the preliminary showing that no genuine issue of material fact exists, the nonmoving party "must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995).

On a motion for summary judgment, the Court must view all facts and related inferences therefrom in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991).

## III. Analysis

### A. The Duty to Defend and Indemnify

All parties agree that Rhode Island law governs this diversity action. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The Journal claims that Travelers owed it a duty to defend the government's CERCLA action, therefore Travelers should pay the costs of defending that action. Likewise, the Journal contends that both Travelers and First State owe it a duty to indemnify it for payment of the settlement amount.

Under Rhode Island law, an insurer's duty to defend an insured is determined by the application of the "pleadings test." *Peerless Ins. Co. v. Viegas*, 667 A.2d 785, 787 (R.I.1995). The court must look at the allegations contained within the complaint against the insured. "[W]hen a complaint contains a statement of facts which bring the case within or potentially within the risk coverage of the policy, the insurer has an unequivocal duty to defend." *Employers' Fire Ins. Co. v. Beals*, 240 A.2d 397, 403 (R.I.1968). The court must resolve any uncertainty as to the adequacy of the pleadings in this respect in favor of the insured. *Id.*

The duty to indemnify, however, is more narrow in scope. *Id.* An insurer's obligation to indemnify is contingent upon whether the injured party will ultimately prevail against the insured. *Id.* Consequently, the court must look to the insured's actual basis for liability to the injured party.

## B. The Construction of Insurance Contracts

■ In determining the question of whether coverage is available to the Journal under either the Travelers or First State Policies, the Court is guided by well-developed Rhode Island law on the construction of insurance policies. Under Rhode Island law, the court must ascertain the intent of the parties by looking at the entire policy. *Johnson v. Western Nat. Life Ins. Co.*, 641 A.2d 47, 48 (R.I.1994).

> The language used in the policy must be given its plain, ordinary, and usual meaning. When the terms are found to be clear and unambiguous, the task of judicial construction is at an end. The contract terms must then be applied as written and the parties are bound by them.

*Malo v. Aetna Casualty and Sur. Co.*, 459 A.2d 954, 956 (R.I.1983) (citations omitted).

■ Policy terms that are ambiguous or susceptible to more than one reasonable interpretation will be strictly construed against the insurer. *Amica Mut. Ins. Co. v. Streicker*, 583 A.2d 550, 552 (R.I.1990). However, a policy "is not to be described as ambiguous because a word is viewed in isolation or a phrase is taken out of context." *McGowan v. Connecticut Gen. Life Ins. Co.*, 110 R.I. 17, 289 A.2d 428, 429 (1972).

## C. Travelers' Motion for Summary Judgment

Travelers argues that it has neither the duty to defend nor the duty to indemnify the Journal for liabilities and costs incurred in settling the government's CERCLA claim because the pollution exclusion clause in its policies bars coverage. The Journal contends that the Travelers pollution exclusion clause is not applicable.

The Travelers Policies provide the following coverages, among others:

> The Travelers will pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed by law upon the insured, or assumed by the insured under any oral or written contract or agreement, as damages because of: (a) bodily injury; or (b) property damage; to which this insurance applies, caused by an occurrence. The Travelers shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient....

Under the Travelers Policies, property damage is defined to mean:

> (a) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom; or (b) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

An "occurrence" is defined as:

> [A]n accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured; except bodily injury committed by or at the direction of the insured to protect any person or property shall be deemed neither expected nor intended from the standpoint of the insured.

■ Ultimately, the Journal, as the insured, bears the burden of establishing the existence of insurance coverage. *See Warwick Dyeing*, 26 F.3d at 1200. Therefore, under the terms of the Travelers Policies, the Journal must prove the following: (1) that it has incurred liability for damages; (2) that the damages arise from property damage; and (3) that the property damage was caused by an occurrence.

The question of whether the Journal has demonstrated these fundamental prerequisites to coverage has not been fully argued to the Court. Travelers states in its memorandum in support of its motion for summary judgment that it does not concede that the requirements for coverage have been shown. Nonetheless, Travelers has failed to address the complex question of whether CERCLA

cleanup and response costs incurred pursuant to a consent decree are "damages" within the meaning of its policy, opting instead to wield the sword of its pollution exclusion clause. Consequently, the Court will not decide this delicate issue which has not been considered by the Rhode Island Supreme Court.[6] Since the Court holds that the pollution exclusion clause in the Travelers Policies bars any coverage, the question of whether the prerequisites for coverage have been established is purely academic.

The jugular vein of Travelers' motion for summary judgment lies in its pollution exclusion clause. It reads:

> Coverages A [Bodily Injury] and B [Property Damage] do not apply ... (p) to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant: (1) if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable; or (2) resulting from or contributed to by any condition in violation of or noncompliance with any governmental rule, regulation or law applicable thereto....[7]

. Travelers makes three distinct arguments under its pollution exclusion clause. First, it argues that clause (1) of the pollution exclusion is applicable because the property damage for which the Journal is liable arises out of a discharge of pollutants that was either expected or intended from the standpoint of the Journal. Travelers' second argument is that clause (1) excludes the Journal's claim because Cannons and the Davis Site operators, persons or organizations for whose acts or omissions the Journal is liable, either expected or intended the discharge that caused the property damage at the Davis Site. Finally, Travelers contends that the Journal's liability under the Consent Decree results from a violation or noncompliance with a governmental rule, regulation or law, and is therefore excluded by clause (2) of the pollution exclusion.

Travelers' first argument must fail. In order for the first component of the exclusion to apply the Journal must be seeking liability coverage for "property damage" arising out of an "emission, discharge, seepage, release or escape" of a "liquid, solid, gaseous or thermal waste or pollutant," and such emission, discharge, seepage, release or escape must be "either expected or intended from the standpoint of the insured."

The Journal admits that its claim is for liabilities due to property damage arising from a discharge of a pollutant. It argues, however, that the final element of that clause has not been satisfied, namely, that the discharge was either expected or intended by the Journal. According to the Journal, its only expectation and intention was that its

**6.** Currently, there is a sharp split in authority on the issue of whether CERCLA response costs are "damages" within the meaning of a comprehensive general liability policy. A majority of jurisdictions have held that governmentally mandated response and environmental cleanup costs are covered as "damages". *See, e.g., Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1216 (1992); *Coakley v. Maine Bonding and Casualty Co.,* 136 N.H. 402, 618 A.2d 777, 785 (1992); *Hazen Paper Co. v. United States Fidelity and Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576, 583–84 (1990). Other states, however, have reached the opposite conclusion. *See, e.g., City of Edgerton v. General Casualty Co. of Wisconsin,* 184 Wis.2d 750, 517 N.W.2d 463, 477–79 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1360, 131 L.Ed.2d 217 (1995); *Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16, 19 (1990). Similarly federal courts applying state law have diverged on this question. *See Intel Corp. v. Hartford Accident & Indem. Co.,* 952

F.2d 1551, 1564 (9th Cir.1991) (applying California law) (costs incurred pursuant to a CERCLA consent decree are covered "damages"); *Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200, 1207 (2d Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990) (applying New York law) (cleanup costs resulting from state administrative proceeding are covered "damages"). *But see Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co., Inc.,* 842 F.2d 977, 987 (8th Cir.) (en banc), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (applying Missouri law) (CERCLA cleanup costs are not "damages"); *Cincinnati Ins. Co. v. Milliken and Co.,* 857 F.2d 979, 981 (4th Cir.1988) (applying South Carolina law) (same).

**7.** Clause (2) excluding liabilities resulting from a discharge in violation of the law is present in only the July 1, 1976 to July 1, 1981 policies.

wastes would be brought to, and incinerated at, the Bridgewater Facility. Therefore, it contends that it did not expect or intend any discharge of pollutants at the Davis Site.

For purposes of its summary judgment motion, Travelers accepts the Journal's contention that it intended its wastes to be disposed of at the Bridgewater Facility. Travelers argues, however, that under its pollution exclusion clause the expectation or intent to discharge pollution at a particular location is irrelevant. Rather, only the act of discharge must be expected or intended by the insured.

The pollution exclusion clause contained in the Travelers Policies is different from the typical "sudden and accidental" pollution exclusion clauses found in most commercial general liability insurance policies. Although it appears that no Rhode Island court has interpreted this particular pollution exclusion clause, several other federal courts, including the First Circuit, have examined it under similar tenets of insurance policy construction.

In *Travelers Ins. Co. v. Waltham Indus. Labs. Corp.*, 883 F.2d 1092 (1st Cir.1989), the First Circuit was required to interpret an identical pollution exclusion clause under Massachusetts law. According to the Court, "[t]he exclusion here becomes operative if the 'emission, discharge, seepage, release or escape' of any pollutant 'is either *expected* or *intended* from the standpoint of any insured....'" *Id.* at 1097 (emphasis added). It was not necessary that the insured expect or intend the resulting damages. *Id.* at 1097–98; *see also Damar, Inc. v. United States Fire Ins. Co.*, 856 F.Supp. 679, 682 (N.D.Ga.1993), *aff'd*, 21 F.3d 1126 (11th Cir.

1994) (the Travelers exclusion focuses on whether the discharge is expected or intended; it makes no reference to whether the *damage* was expected or intended) (emphasis in original); *Travelers Indem. Co. v. Dingwell*, 414 A.2d 220, 223 (Me.1980) ("[t]he plain meaning of the Travelers exclusion is that it applies only to 'expected or intended' releases of pollutants").

This Court agrees that the relevant inquiry under the Travelers pollution exclusion clause is whether the Journal or a person or organization for whose acts the Journal is liable expected or intended the discharge of pollutants, and not whether the property damage at the Davis Site was expected or intended. Therefore, the fact that the Journal did not expect or intend the property damage which occurred at the Davis Site is of no moment. The question is, however, whether the fact that the Journal expected and intended its waste to be incinerated at the Bridgewater Facility precludes application of the pollution exclusion clause.

Once again, the Court is unable to find Rhode Island case law dealing directly with this question. The First Circuit's recent opinion in *Warwick Dyeing* applying Rhode Island law to a similar pollution exclusion clause, however, is highly instructive on this issue.

The Court in *Warwick Dyeing* was interpreting a "sudden and accidental" pollution exclusion clause.[8] The Court, however, focused its entire holding on the "accidental" prong of the exclusion, opting to circumvent the Sphinx's Riddle of whether the term "sudden" was laden with ambiguity.[9] It stated:

---

8. The pollution exclusion clause at issue in *Warwick Dyeing* stated:

It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.

26 F.3d at 1199. This exclusion, however, contained the following exception: "[t]his exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." *Id.*

9. As the *Warwick Dyeing* Court noted, *id.* at 1201, even the First Circuit has split over the meaning of the term "sudden" as used in the "sudden and accidental" pollution exclusion clause. *Compare CPC Int'l, Inc. v. Northbrook Excess and Surplus Ins. Co.*, 962 F.2d 77, 91–98 (1st Cir.1992) (holding "sudden" ambiguous), *with Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc.*, 938 F.2d 1423, 1429–30 (1st Cir.1991), *cert. denied*, 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992) (holding "sudden" unambiguous).

This case, however, can be decided without determining whether "sudden" is ambiguous or unambiguous. Despite the deep divisions in their holdings, almost all courts agree, and the parties to this case agree as well, that the term "sudden and accidental," means, at the very least, "unintended and unexpected." In other words, intentional and expected discharges of pollutants are not covered under policies with the standard pollution exclusion.

*Warwick Dyeing*, 26 F.3d at 1201 (citations omitted). Therefore, the issue before the First Circuit in *Warwick Dyeing* was the same issue as is now before this Court: was there an expected or intended discharge of pollutants?

The Court in *Warwick Dyeing* relied on the following undisputed facts:

Warwick purposefully arranged to have its waste materials collected and hauled off its property. Those materials were disposed of in the L & RR landfill. At the same time, Warwick presumed that its wastes were disposed of lawfully and properly. It neither expected nor intended that contamination of the environment would result from the disposal of its wastes.

*Id.* Similarly, the Court stated that "Warwick did not know the particular site where its waste would be disposed, and, indeed, the record does not reveal whether Warwick actually knew that its waste would be deposited in a landfill to begin with." *Id.* at 1202.

The *Warwick Dyeing* Court applied these undisputed facts to the pollution exclusion clause and held that the exclusion applied because the insured's discharge of waste was expected and intended. *Id.* at 1203–05. The First Circuit, in its opinion, brushed aside two principal arguments made by the insured. First, it dismissed the insured's contention that the relevant discharge must be one by the insured itself, and not by a third party, such as a waste hauler. The Court held:

The plain and unambiguous language of the pollution exclusion concerns "property damage arising out of *the* discharge," not "*its* discharge" or "the *insured's* discharge." We thus see nothing in the poli-

cy to indicate that the exclusion is limited to discharges by the insured.

*Id.* at 1202 (emphasis in original).

The Court also dismissed the insured's argument that the relevant discharge under the pollution exclusion was the release of pollutants from the landfill into the surrounding environment, and not the initial disposal of waste into the landfill. The insured contended that, even if the disposal of wastes at the landfill was intended and expected, the subsequent release into the surrounding environment was entirely unexpected. The First Circuit did not accept this distinction:

We reject Warwick's argument as merely an attempt to recast the damages in this case as a separate discharge.... To describe such releases as a separate event constituting an independent discharge would eviscerate the important distinction established between intentional and expected damages and intentional and expected discharges.

*Id.* at 1204.

According to Travelers, the First Circuit's opinion in *Warwick Dyeing* mandates the granting of summary judgment in its favor. It argues that the relevant facts of this case parallel the facts relied upon by the First Circuit in deciding *Warwick Dyeing*. To bolster its argument, Travelers also relies on the recent case of *Lafarge Corp. v. Travelers Indem. Co.*, 927 F.Supp. 1534 (M.D.Fla.1996), which involved the construction of the same Travelers pollution exclusion clause at issue in this case. In *Lafarge*, the Court cited *Warwick Dyeing* in holding that the Travelers pollution exclusion clause barred coverage despite the fact that the insured's disposal contractor diverted the waste from its intended destination. *Id.* at 1538. According to the Court, "[t]he fact that General Portland contracted to dispose of the cement waste in the Seffner landfill and it was diverted to the instant Site by Jernigan Trucking is of no consequence." *Id.*

The Journal contends that *Warwick Dyeing* is simply not applicable because the two operative pollution exclusion clauses have different language. The Journal also argues that in this case, unlike the insured in *Warwick Dyeing*, it did not turn its waste over to

a third party without regard to the consequences of its disposal. Rather, it specifically intended that its waste would be incinerated at the Bridgewater Facility.

Clearly, the discharge of liquid waste at the Davis Site was not expected or intended from the standpoint of the Journal, as required by the pollution exclusion clause. In *Warwick Dyeing*, the First Circuit held that a generator of hazardous waste cannot in the ordinary course of business arrange for the disposal of its waste, and simply turn a blind eye to its final destination. *Warwick Dyeing*, however, does not extend to a generator who specifically intended a disposal different from that which caused the property damage. As the Court stated:

> We think it would strain common sense to find that ACME's disposal of Warwick's waste in a landfill was unexpected or unintended by Warwick. A landfill is a sufficiently common, if not likely, destination for the disposal of waste. We see no error in presuming that a party arranging to have its waste disposed of by a licensed hauler would not find it fortuitous, unforeseen, unusual, or otherwise contrary to its expectations that its waste was disposed of at a landfill. This is not a case where ACME did something surprising or out of the ordinary with the waste after collecting it from Warwick. ACME did not dump the waste in a river or at an illegal dumping ground.

*Warwick Dyeing*, 26 F.3d at 1202–03. Unlike *Warwick Dyeing*, this is a case in which the licensed hauler actions were surprising to the generator of the waste and out of the ordinary.

 The language of the Travelers pollution exclusion states that no coverage lies for "property damage" arising out of any discharge of pollutants "if *such* . . . discharge . . . is either expected or intended from the standpoint of any Insured." (emphasis added). Therefore, it is clear that the discharge which *caused* the property damage must be expected or intended by the insured; it is not enough that the insured expect any discharge. Although *Warwick Dyeing* illustrates that an insured with no particular expectations as to the destination of its waste

will be charged for all foreseeable discharges, it does not extend to an insured which intends a specific discharge different from that which occurs. It would torture logic and the plain meaning of the Travelers pollution exclusion clause to hold that an insured which intends one discharge can simultaneously intend another.

 Although the Journal escapes the grasp of the first prong of Travelers' pollution exclusion clause, it is hopelessly ensnared by the second. The pollution exclusion excludes coverage for "property damage" arising out of any "discharge" of any "pollutant" if such discharge is "either expected or intended from the standpoint of any person or organization for whose acts or omissions any insured is liable." Travelers argues that Cannons and the Davis Site operators, persons or organizations who have created liability for the Journal, clearly intended the discharge at the Davis Site. The Journal contends that this prong of the pollution exclusion applies solely to its employees under the doctrine of respondeat superior. Consequently, it argues that the intent of Cannons and the Davis operators, clearly independent contractors, is irrelevant.

This Court cannot accept the Journal's position that the term "is liable" as used in the Travelers pollution exclusion clause is limited to liability imposed by the doctrine of respondeat superior. This construction would require the Court to read words into the Travelers Policies which are simply not present. It has been firmly established by the Rhode Island Supreme Court that a Court interpreting an insurance policy must begin with the plain meaning of the policy terms. *Malo*, 459 A.2d at 956. The Court must "refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity into a policy where none is present." *Mallane v. Holyoke Mut. Ins. Co. in Salem*, 658 A.2d 18, 20 (R.I.1995). The Journal's interpretation of the pollution exclusion offends these well-established principles.

 The Travelers pollution exclusion refers simply to "*any* person or organization for whose acts or omissions any insured *is*

*liable."* (emphasis added). "Liable" has been defined by Black's Law Dictionary as "[b]ound or obligated in law or equity; responsible; chargeable; answerable; compellable to make satisfaction, compensation, or restitution." *Black's Law Dictionary* 915 (6th ed. 1990). Similarly, as the Rhode Island Supreme Court stated in *Zarrella v. Miller,* 100 R.I. 545, 217 A.2d 673, 675 (1966), the term "liable" refers to culpability and the existence of a cause of action. Consequently, liability is a broad and expansive concept. *See Montauk Oil Transp. Corp. v. Tug "El Zorro Grande",* 54 F.3d 111, 114 (2d Cir. 1995) ("liability" is defined broadly).

Numerous theories of liability exist. These include, *inter alia,* joint and several liability, strict liability, enterprise liability, and vicarious liability. The Travelers pollution exclusion clause neither makes reference to, nor does it exclude, any of these potential theories of liability. Instead, it refers generally to the broad concept of liability, the process of being bound or obligated by the law. Therefore, the Court will not confine its inquiry to the doctrine of respondeat superior.

The Journal is clearly liable under CERCLA for the acts or omissions of Cannons. Although the Journal is correct in stating that it is not bound by the acts or omissions of Cannons, an independent contractor, because of a master-servant relationship, it fails to consider the nature of liability imposed under CERCLA. Pursuant to § 107(a)(3) of CERCLA:

[A]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ... shall be liable for—(A) all costs or removal or remedial action incurred by the United States Government....

42 U.S.C. § 9607(a)(3) (1994).

█ Courts have generally required proof of four elements to invoke the generator liability scheme of § 107(a)(3):

(1) the generator must have disposed of hazardous substances; (2) the disposal must have been at a facility which contains at the time of discovery hazardous substances of the kind disposed of by the generator; (3) there must be a release or threatened release of that or any hazardous substance; and (4) the release or threatened release must trigger the incurrence of response costs.

*U.S. v. Davis,* 882 F.Supp. 1217, 1220 (D.R.I. 1995).[10] Since CERCLA imposes strict liability on responsible parties, *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir.1989), a generator's intent and knowledge are irrelevant under § 107(a)(3). *See O'Neil v. Picillo,* 682 F.Supp. 706, 719 n. 2 (D.R.I.1988), *aff'd,* 883 F.2d 176 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990). Consequently, it is not necessary for a generator to choose a particular disposal site to be liable under § 107(a)(3). *Davis,* 882 F.Supp. at 1221. Similarly, the fact that a transporter diverts waste to a site different from that chosen by the generator is not a defense to liability under this statute. *Id.*

█ Therefore, under the strict liability scheme of CERCLA the Journal is liable for Cannon's acts, despite the fact that it is an independent contractor.[11] Although the

---

**10.** A limited defense exists under § 107(a) for those potentially responsible parties who can establish that they exercised due care with respect to the hazardous substances involved and can demonstrate, *inter alia,* that the release was caused solely by a third party's act or omission. 42 U.S.C. § 9607(b)(3) (1994). Under this statute, however, a potentially responsible party is deemed responsible for the acts or omissions of its employees, agents, and other persons or entities with which it has a contractual relationship. *U.S. v. DiBiase,* 45 F.3d 541, 545 n. 4 (1st Cir.

1995). Consequently, this defense would be unavailable to a generator like the Journal which had a contractual relationship with the third party waste disposal company responsible for the release. *See City of New York v. Exxon Corp.,* 766 F.Supp. 177, 195 (S.D.N.Y.1991).

**11.** The Journal argues that because CERCLA became effective on December 11, 1980, its liability scheme cannot be extended to the Travelers Policies in existence from July 1, 1976 to July 1, 1980. CERCLA, however, applies retroactively

Journal still maintains that its waste was never discharged at the Davis Site, it argues that if such discharge occurred, it was because of a diversion on the part of Cannons. The Journal now seeks insurance coverage for the $650,000 liability plus interest and costs it incurred in settling the government's CERCLA action, yet it argues that it is not liable for the acts of Cannons. The Journal cannot have its cake and eat it too. It is clear to the Court that the Journal's liability derives both from its status as a generator of hazardous waste, and from Cannon's act of disposal at the Davis Site.

The discharge of the Journal's liquid waste at the Davis Site was undeniably expected and intended from the standpoint of Cannons; the Journal concedes this fact. Consequently, Travelers has neither the duty to defend nor indemnify the Journal against the government's CERCLA action and the liabilities resulting from the Consent Decree, since this claim is for property damage arising out of a discharge of a pollutant that was expected and intended from the standpoint of an organization for whose acts the Journal is liable.

**D. First State's Motion for Summary Judgment**

First State moves for summary judgment based upon the argument that no live controversy presently exists between itself and the Journal.[12] It contends that since the Journal's liability has been fixed by the Consent Decree at $1,068,142.81, no coverage is implicated under its second-tier excess policies which require that the underlying $500,000 Travelers Policies and $3,000,000 American Policies first be exhausted. The Journal admits that at present it has not incurred any liabilities which would be covered by the First State Policies. It concedes that its

claim against First State is based solely on the possibility of future liabilities which might arise under paragraphs 10, 11 and 13 of the Consent Decree due to unknown conditions at the Davis Site or off-site disposals. Nonetheless, the Journal argues that the Court should not dismiss any of the defendants until all coverage issues have been determined relating to this litigation.

■ This Court is empowered to grant declaratory relief by the Declaratory Judgment Act, 28 U.S.C. § 2201. It reads, in pertinent part:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration....

28 U.S.C. § 2201(a) (1994). Declaratory relief under 28 U.S.C. § 2201(a) is discretionary. *United States Liab. Ins. Co. v. Selman,* 70 F.3d 684, 693–94 (1st Cir.1995). Since the Declaratory Judgment Act is procedural in nature, federal law controls the question of whether a district court may grant declaratory relief in a given case. *Britamco Underwriters, Inc. v. C.J.H., Inc.,* 845 F.Supp. 1090, 1092 (E.D.Pa.1994), *aff'd,* 37 F.3d 1485 (3d Cir.1994); *Louisiana Nevada Transit Co. v. Marathon Oil Co.,* 770 F.Supp. 325, 327 (W.D.La.1991), *aff'd,* 985 F.2d 797 (5th Cir.1993).

■ The Declaratory Judgment Act applies only to "a case of actual controversy," thereby incorporating the Article III requirement that a federal court only entertain "cases or controversies." *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,* 300 U.S. 227, 239–40, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937); *Indemnity Ins. Co. of N.*

to pre-enactment conduct and pre-enactment costs incurred by the government. *O'Neil,* 883 F.2d at 183 n. 12. The Court cannot discern either from the plain meaning of the language contained in the Travelers Policies or from the intent of the contracting parties any attempt to cabin the definition of "liable" to only those legal or equitable obligations imposed at the time of contract formation.

12. At oral arguments on First State's motion for summary judgment, both counsel for First State and counsel for the Journal represented to the Court that coverage under the First State Policies tracks coverage under the Travelers Policies. Therefore, if no coverage was available under the Travelers Policies no coverage would lie under the First State Policies. Neither party, however, has submitted any documentation from which the Court can rule on this ground for summary judgment.

**1080**

*Am. v. Kellas,* 173 F.2d 120, 123 (1st Cir. 1949). It is hornbook law that,

> A "controversy" in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Haworth,* 300 U.S. at 240–41, 57 S.Ct. at 464 (citation omitted); *see also United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.,* 508 U.S. 439, 446, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993) (federal courts lack the power to give advisory opinions); *Selman,* 70 F.3d at 694 n. 9 (federal courts have no obligation to answer hypothetical questions).

■ Although a justiciable controversy existed between the Journal and First State at the commencement of this action, no live controversy endures between these parties following the Consent Decree. Pursuant to the Consent Decree, the liability of the Journal was fixed at $1,068,142.81. The Journal, however, has no claim against the First State Policies until the $3,000,000 American Policies are first exhausted. Therefore, the factual predicates to coverage under the First State Policies have not occurred. In fact, they probably never will take place. This Court cannot decide a case based on such hypothetical, contingent future events. Consequently, First State's motion for summary judgment is granted.[13]

### IV. Conclusion

For the foregoing reasons, defendant Travelers' motion for summary judgment is granted and defendant First State's motion for summary judgment is granted. No judgment will enter until all claims in this matter are resolved.

It is so ordered.

---

**13.** First State has also moved this Court pursuant to Rule 54(b) of the Federal Rules of Civil Procedure to direct the entry of final judgment against the Journal. It is well-recognized that Rule 54(b) must be applied so as to preserve "the historic federal policy against piecemeal appeals." *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 438, 76 S.Ct. 895, 901, 100 L.Ed. 1297 (1956). Ultimately, the entry of final judgment under Rule 54(b) is left to the sound discretion of this Court. *See Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 7–8, 100 S.Ct. 1460, 1464–65, 64 L.Ed.2d 1 (1980). The Court declines to enter judgment now in this case.