**TRAVELERS INSURANCE COMPANY,**
Plaintiff, Appellee,

v.

**WALTHAM INDUSTRIAL LABORATO-
RIES CORPORATION, et al.,**
Defendants, Appellants.

No. 89–1077.

United States Court of Appeals,
First Circuit.

Heard June 5, 1989.

Decided Aug. 18, 1989.

As Amended Aug. 29, 1989.

Anton T. Moehrke with whom Kim Maree Johannessen and Wright & Moehrke, P.C., were on brief, for defendants, appellants.

Thomas L. Crotty, Jr., Peter J. Kalis, Thomas M. Reiter, James R. Segerdahl, Kirkpatrick & Lockhart, John J. Weltman, Brown Rudnick Freed & Gesmer, William Hart, Thomas H. Sear and Anderson Russell Kill & Olick on brief, for United Technologies Corp., Westinghouse Elec. Corp., Polaroid Corp. and Textron Inc., amici curiae.

Daniel O. Mahoney with whom Steven L. Schreckinger, Tamara S. Wolfson, Cassandra Warshowsky, Palmer & Dodge, John P. Graceffa and Gallagher & Gallagher, P.C., were on brief, for plaintiff, appellee.

Thomas W. Brunner with whom Marilyn E. Kerst, Matthew S. Bode and Wiley, Rein & Fielding were on brief, for Ins. Environmental Litigation Ass'n, amicus curiae.

Before BOWNES, REINHARDT,* and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

This case involves the interpretation of a pollution exclusion in insurance policies issued by plaintiff-appellee, Travelers Insurance Company, to defendants-appellants, Waltham Industrial Laboratories Corp. (WIL), and Memory Lane, Inc. Defendant-appellant Melvin Rosenfeld was the founder and chief executive officer of WIL. The other defendant-appellant is Rosenfeld's wife, Phyllis, who owned and operated Memory Lane, Inc. The district court issued summary judgment in favor of Travelers holding that it had no duty to defend two law suits brought against defendants and had no duty to indemnify defendants for the expenses incurred in defending and settling the law suits. The district court also granted summary judgment for Travelers in a pendent state law action brought against it by defendants pursuant to Mass. Gen.Laws Ann. ch. 93A.

The basic issue on appeal is whether the pollution exclusion applies.

## I. BACKGROUND

In 1959, Melvin Rosenfeld, a chemical engineer, founded WIL and started an electroplating business. WIL leased a parcel of land and buildings from First Republic Corporation at 225 Crescent Street in the city of Waltham, Massachusetts. At the start of its operation, WIL occupied Building 16 and a portion of Building 17. As its business expanded, WIL occupied all of Building 17 and Buildings 18 and 19.

Electroplating involves the use of corrosive chemicals. WIL's disposal of the chemical wastes used in its business engendered concern and complaints by its landlord and local and state officials. In 1967, First Republic, WIL's landlord, expressed apprehension that the use of the corrosive chemicals and their disposal was causing damage to the metal surfaces of the leased buildings and other damages to the leasehold.

First Republic was not the only one concerned about the side effects of WIL's electroplating operation. In 1971 Rosenfeld and the Superintendent of the City of Waltham's Public Works Department were warned by the Director of the Water Resources Commission of the Commonwealth that WIL's daily discharge of untreated electroplating wastes into the municipal sewerage lines would cause damage to the lines. Also in 1971, WIL was notified by the Massachusetts Division of Water Pollution Control that some of its electroplating wastes were running into the Charles River and it was ordered to abate this pollution. In September of 1973, the Metropolitan District Commission (MDC) notified WIL that it was violating MDC regulations relative to the discharge of chemicals and toxic heavy metals into the sewerage system. There was an investigation by the MDC. Its investigative report made specific findings: WIL had made illegal cross-connections between its rinsing and plating tanks and the public water supply without using adequate safety measures; seepage from WIL's tanks drained through holes in the floor of the buildings into the basement; and there were illegal discharges of waste, including sludge, into the sewerage system which was eating away the sewerage pipes and pumping equipment at the site. The MDC recommended that WIL's sewerage line be disconnected to prevent further pollution and damage.

On October 2, 1973, Rosenfeld acknowledged that his company was discharging about 35,500 gallons of untreated chemical wastes into the municipal sewerage system daily. The wastes contained cyanide, acids, nickel, aluminum and zinc. Rosenfeld indicated that he would try to correct the problem. A plan for pretreatment of its industrial wastes was submitted by WIL to the MDC in 1974, but it was never implemented. WIL did install a mechanism for moderating the pH of its discharges in 1977 but it did not function properly all the time. WIL ceased operations in March of 1984. Chemical-waste sludge was found in the crawl spaces beneath Buildings 18 and 19.

---

* Of the Ninth Circuit, sitting by designation.

The other corporate defendant, Memory Lane, Inc. was formed in August 1983 by Phyllis Rosenfeld, wife of Melvin Rosenfeld. Its main business was the preservation of baby shoes by using a baked-on preservative. The end product resembled a ceramic shoe. Phyllis Rosenfeld had started this business as a home operation in 1955. In the early 1960's Memory Lane became a division of WIL; its operations were carried on in a portion of Building 17.

Travelers issued policies to WIL covering the period from December 1, 1979 to December 1, 1984. The last policy was cancelled as of October 1, 1984. It also issued a policy to WIL and Memory Lane for the period July, 1984 to July, 1985. The pertinent provisions of the policies will be discussed later.

## II.  THE LAWSUITS

On November 30, 1984, First Republic brought a complaint against the four defendants in the Superior Court for Middlesex County, Massachusetts. On August 12, 1985, the Massachusetts Water Resources Authority brought a complaint against WIL, Melvin Rosenfeld and First Republic in the Suffolk County Superior Court. On the same day, August 12, 1985, the Commonwealth moved that the action by the Water Resources Authority be consolidated with the pending action of First Republic against WIL. The motion was assented to by First Republic and WIL; it was allowed on August 15, 1985. On January 30, 1987, First Republic filed an amended complaint in Suffolk County Superior Court. We discuss in detail, *infra,* the allegations in these complaints.

Travelers disclaimed coverage in the suit by First Republic and refused to defend. It agreed to defend the suit by the Massachusetts Water Resources Authority but under a reservation of rights. A payment of $10,000 was made by Travelers towards the defense of this suit. This payment was made prior to the time both actions were consolidated for trial.

On March 27, 1987, Travelers brought a declaratory judgment action in federal district court pursuant to 28 U.S.C. §§ 2201 and 2202. It sought a judgment declaring that it had no duty to defend the defendants in the consolidated lawsuit brought against them by First Republic and the Massachusetts Water Resources Authority. On April 29, 1987, defendants answered and filed a counterclaim. The counterclaim sought a preliminary injunction ordering Travelers to pay one-third of the defense costs, a declaration that Travelers was obligated to defend and indemnify in the underlying action and a declaration that Travelers had engaged in unfair and deceptive actions under Mass.Gen.Laws Ann. ch. 93A, § 2 and Mass.Gen.Laws ch. 176D, § 3(9).

On November 9, 1987, First Republic and the four defendants entered into a settlement agreement that provided for the payment of $242,500 by defendants to First Republic. The agreement states in a "Whereas" clause that defendants WIL and Melvin Rosenfield have agreed to pay the sum of $27,500 in settlement of all claims of the Commonwealth in the suit brought by the Massachusetts Water Resources Authority. An agreement for judgment in both cases was entered in Suffolk County Superior Court on November 23, 1987.

On March 15, 1988, Travelers moved in federal court for partial summary judgment on the question of its duty to indemnify the defendants for the sums paid in settlement. On the same date defendants moved for summary judgment on their counterclaim. A month later, April 15, Travelers filed a cross motion for summary judgment on the question of its duty to defend in the two suits and in the defendants' pendent state claim brought under Mass.Gen.Law Ann. ch. 93A. The parties opposed each other's motions for summary judgment.

This appeal followed the district court's granting of Travelers' motions for summary judgment and its denial of defendants' summary judgment motion.

## III.  THE POLLUTION EXCLUSION

Each of the insurance policies stated:

1.  COVERAGE A—BODILY INJURY LIABILITY

COVERAGE B—PROPERTY DAMAGE LIABILITY

The Company will pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as damages because of

Coverage A—bodily injury or

Coverage B—property damage

to which this insurance applies, caused by an **occurrence,** and the Company shall have the right and duty to defend any suit against the **Insured** seeking damages on account of such **bodily injury or property damage,** even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

(Emphasis in original).

This is followed by the exclusions; the pollution exclusion states:

This insurance does not apply: to **bodily injury or property damage** arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any **insured** or any person or organization for whose acts or omissions any **insured** is liable.

(Emphasis in original).

Occurrence is defined as follows:

**"Occurrence"** means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury or property damage** neither expected nor intended from the standpoint of the **Insured.**

The construction and interpretation of the policy provisions is made in accord with Massachusetts law which, as far as we can determine, follows and, at times, leads the mainstream of cases. The first thing we must do is determine the parameters of Travelers' duty to defend. Massachusetts holds:

An insurance company's obligation to defend against a liability claim is determined by the allegations in the complaint. 'It is settled in this jurisdiction, and generally elsewhere, that the question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are "reasonably susceptible" of an interpretation that they state ... a claim covered by the policy term, the insurer must undertake the defense. *See Vappi & Co. v. Aetna Casualty & Sur. Co.,* 348 Mass. 427, 431, 204 N.E.2d 273 (1965); *Magoun v. Liberty Mut. Ins. Co.,* 346 Mass. 677, 681–682, 195 N.E.2d 514 (1964); *Terrio v. McDonough,* 16 Mass. App.Ct. 163, 166, 450 N.E.2d 190 (1983).' *Continental Casualty Co. v. Gilbane Bldg. Co.,* 391 Mass. 143, 146–147, 461 N.E.2d 209 (1984), citing *Sterilite Corp. v. Continental Casualty Co.,* 17 Mass. App.Ct. 316, 318, 458 N.E.2d 338 (1983).

*Lusalon, Inc. v. Hartford Acc. & Indem.,* 400 Mass. 767, 511 N.E.2d 595, 598 (1987) (footnote omitted). We turn, therefore, to the complaints.

A.  *First Republic's Original Complaint*

The pertinent statements in First Republic's original complaint are as follows. WIL was required to vacate the leased premises by September 30, 1984, but failed to do so. WIL and Melvin Rosenfeld have "repeatedly and knowingly" violated the statutes and regulations of Massachusetts "by releasing hazardous materials into the environment at the site." These defendants, along with defendant Phyllis Rosenfeld, have violated the terms of the lease prohibiting the release of any noxious materials. On or about August 8, 1984, Memory Lane, Inc. was incorporated. WIL, which was under order by the city and the Metropolitan District Commission to cease and desist the discharge of hazardous wastes, transferred its assets to Memory

Lane, Inc. Memory Lane, Inc. continued the electroplating business on behalf of WIL, despite the notice to quit the premises by September 30, 1984.

The pertinent allegations of the complaint state the following. Count I: In April 1, 1984, First Republic was notified by the attorney general's department that violations of state hazardous waste laws were occurring in the leased premises. WIL had been in the electroplating business at the site for twenty-five (25) years. In April of 1984, defendants WIL, and Melvin and Phyllis Rosenfeld were notified by the Commonwealth of their responsibility to clean up the hazardous waste at the site. WIL and defendants Melvin and Phyllis Rosenfeld individually have permitted the release of hazardous materials and are legally responsible for it. Defendants knew or should have known that their discharge of hazardous waste violated state statutory and regulatory provisions.

> The damage claimed is stated as follows: As a result of the release of hazardous materials by the defendants within the area occupied by them as tenants of First Republic at the site, the brick work, steel structure, plaster, floor surfaces, doors, windows and sills and ceiling and piping and electric conduit therein have become pitted, corroded and partially destroyed.

The allegations of Count II focus on the transfer of assets by WIL and Melvin and Phyllis Rosenfeld to Memory Lane, Inc.

### B. *First Republic's Amended Complaint*

The amended complaint added two counts. Count III alleges that defendants Melvin and Phyllis Rosenfeld and Waltham, negligently permitted the release of hazardous materials at the site and that defendants are jointly and severally liable for the cost of rectifying the condition and the lost rent resulting from the condition at the site. Count IV alleges that Waltham and the Rosenfelds "negligently maintained a nuisance at the site by permitting a release of hazardous materials to occur" and are jointly and severally liable for the cost of rectifying the condition and for lost rent.

### C. *Complaint of Massachusetts Water Resources Authority*

The action is described as one "relating to unlawful discharges of waste, toxic chemicals and heavy metals to [sic] the metropolitan sewer system, and recovery of cleanup costs resulting from the release of hazardous wastes."

We quote or summarize the pertinent factual allegations.

Waltham Industrial Lab Corporation ("WIL") is or was engaged in the business of electroplating, in which various metals are plated with other metals including cadmium, zinc, copper, nickel and chromium. WIL discharges approximately 35,500 gallons per day of contaminated waste water into the MWRA sewer system. This wastewater contains various levels of the above metals as well as acids, caustics and cyanides.

WIL failed to install and operate pH neutralization and pretreatment facilities also ordered by the Metropolitan District Commission (MDC). The MDC issued an Industrial User Discharge Permit to WIL under the terms of which WIL was required to submit discharge reports or progress reports. WIL never submitted the required reports to the MDC.

On April 22, 1981, representatives of the MDC inspected WIL and conducted a sampling of the effluent from the facility. The sampling by the MDC indicated that excessive amounts of toxic heavy metals, cadmium, total chromium, nickel and zinc were discharged and that the pH of the discharge varied from 2.11 to 10.48.

On October 24, 1983, representatives of MDC inspected the WIL facility. This inspection revealed that: (1) the pH neutralization system was not operating and therefore that contaminated effluent was discharged directly into the MDC sewer system; (2) no other pretreatment or removal of heavy metals was either installed or operating at the facility; and (3) samples taken and analyzed by MDC indicated that excessive amounts of copper, cadmium, zinc, cyanide and chromi-

um were discharged by the facility into the sewer system.

On December 27, 1983, representatives of the MDC again inspected WIL and discovered that: (1) leaks from a zinc plating area resulted in the discharge of a contaminated process liquid directly into the sewer system (2) the pH neutralization system was not operating and untreated effluent was discharged into the sewer system; and (3) holes in the floor of the facility allowed contaminated drainage to flow directly into the MDC sewer system.

At various times from September 28, 1973 until the present, one or more pipes, trenches or other conveyances were used by defendants intentionally or negligently to discharge pollutants, untreated process waste and sludges directly into the MDC (and MWRA) sewer system as well as waters of the Commonwealth.

At various times from 1973 to the present, defendants intentionally or negligently allowed hazardous wastes and other chemicals used at the WIL facility to flow and seep through the walls and floor of the site into the ground and groundwater, and then into the Charles River.

Count I alleges violations of two Massachusetts statutes and Massachusetts Water Resources Board regulations. Count II alleges violations of the Massachusetts Clean Water Act. Count III alleges violations of another statute and regulations promulgated under it. Count IV alleges that defendants are jointly and severally liable for the cost of removal of the hazardous wastes from the site and cleaning up the site. Count V alleges the maintenance of a public nuisance by the defendants. Count VI alleges strict liability. Count VII alleges negligence by the defendants.

We think it clear that the claims and allegations in the three complaints raised a legitimate question as to Traveler's duty to defend. It, therefore, had a right to bring a petition for declaratory judgment to determine whether the pollution exclusion applied. *See Sterilite Corp. v. Continental Cas. Co.,* 17 Mass.App. 316, 458 N.E.2d 338, 343–44 (1983), *further review denied,* 391 Mass. 1102, 459 N.E.2d 826 (1984).

We start our analysis by recognizing that under Massachusetts law, as elsewhere, "exclusions from insurance coverage are to be strictly construed" and "any ambiguities in insurance contracts are to be resolved against the insurer." *Quincy Mut. Fire Ins. Co. v. Abernathy,* 393 Mass. 81, 469 N.E.2d 797, 799 (1984). We first note that this exclusion is different from most pollution exclusions which exclude bodily or property damage arising from the discharge, disposal, release or escape of a long list of pollutants and then state, "but this exclusion does not apply if such discharge, dispersal, release or escape is *sudden* and *accidental.*" *See, e.g., Great Lakes Container v. National Union Fire Ins.,* 727 F.2d 30, 33 (1st Cir.1984) (emphasis added). The exclusion here becomes operative if the "emission, discharge, seepage, release or escape" of any pollutant "is either *expected* or *intended* from the standpoint of any insured...." (Emphasis added).

We have been unable to find any cases involving an identical pollution exclusion clause. There is, however, a recent Massachusetts case construing a property damage exclusion using the words "expected" or "intended." In *City of Newton v. Krasnigor,* 404 Mass. 682, 536 N.E.2d 1078 (1989), a homeowner's insurance policy issued to the City of Newton excluded "property damage ... which is expected or intended by the insured." *Id.* at 683, 536 N.E.2d 1078. There was a fire at the junior high school causing considerable property damage. The city brought an action in tort for damages against the three youths that started the fire. A declaratory judgment action was brought by the insurer seeking a declaration that the exclusion applied and there was no coverage. The jury found that one of the youths, Krasnigor, intended to start a fire or fires at the school but that he "did not 'specifically intend[ ] to cause the substantial damage which was ultimately sustained' at the school and that he was not 'substantially certain that his actions at the [school] ... would result in the substantial damage

which was ultimately sustained.'" *Id.* at 683, 536 N.E.2d 1078. The trial court found the exclusion inapplicable, as did the appeals court. The Supreme Judicial Court reversed, holding that the jury's finding that the youth deliberately intended to set a fire implied as a matter of law an intent to cause some property damage. The court also held that the exclusion applied to the youth's activities. *Id.* at 684, 536 N.E.2d 1078. The court then stated:

> In reaching this conclusion, we state that the policy's exclusion applies when there is a showing of a deliberate setting of a fire by the insured with the intent of causing some property damage. The insured need not intend to cause the exact extent of the injury which results, in order for the exclusion to apply.

*Id.* at 685, 536 N.E.2d 1078. In further explaining its reasoning, the court discussed the case on which the trial judge had relied, *Quincy Mut. Fire Ins. Co. v. Abernathy*, 469 N.E.2d 797:

> In *Abernathy*, we stated that "the resulting injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." *Quincy Mut. Fire Ins. Co. v. Abernathy, supra* [393 Mass.] at 84 [469 N.E.2d 797]. The "resulting harm" concerns the type of harm inflicted—whether personal injury or property damage—and not the extent of the harm actually sustained.

*Newton v. Krasnigor*, 404 Mass. at 686, 536 N.E.2d 1078. The court pointed out that in *Abernathy*, the crucial question was whether any injury was intended, not whether the intent was "to cause the precise magnitude of the injuries sustained." *Id.*

Although not precisely on point, the case law involving a general exclusion exception due to a "sudden and accidental" occurrence is sufficiently within the target area to merit consideration. In *Shapiro v. Public Service Mut. Ins. Co.*, 19 Mass.App. 648, 477 N.E.2d 146 (1985), *further review*

denied, 395 Mass. 1102, 480 N.E.2d 24 (1985), the question was whether the escape of oil from an underground tank "was 'sudden and accidental' within the meaning of the exception to the exclusion." *Id.* at 149. The leak was caused by corrosion to the tank. The court upheld the trial court's finding that the "escape of oil was 'sudden and accidental' within the meaning of the exception to the exclusion clause." *Id.* at 150.

*U.S. Fidelity and Guar. v. Star Fire Coals, Inc.*, 856 F.2d 31 (6th Cir.1988), involved a claim against a mine operator for bodily injury due to the emission of excessive amounts of coal dust from the mine tipple during its operation. The Sixth Circuit applied Kentucky law and found that the "sudden and accidental" exception did not apply because the emissions took place over a seven to eight year period "as a normal part of the coal processing operation." It held: "The sudden and accidental exception to that exclusion is inapplicable here where the pollutants at issue were discharged on a regular ongoing basis." *Id.* at 35.

So also in *Great Lakes Container v. National Union Fire Ins.*, 727 F.2d at 33, we held that the "sudden and accidental" exception to the exclusion clause did not apply where the allegation was that "Great Lakes is liable because pollution and contamination of the soil, surface and subsurface waters has taken place as a concomitant of its regular business activity."

## IV. DUTY TO DEFEND

■ When the exclusion is read against the allegations of the complaints in light of the pertinent legal principles, there can be little doubt that it applies. The Commonwealth complaint alleges that WIL discharged 35,500 gallons of contaminated waste water which contained acids, caustics and cyanides into the metropolitan sewer system daily, that defendants were notified repeatedly that WIL's discharges were going into the sewer system and into the ground and that defendants did nothing effective to reduce or abate the discharge of pollutants.

The amended complaint of First Republic alleged that defendants "repeatedly and knowingly" released hazardous materials into the environment at the site.

We do not see how it can be tenably argued that such discharge was neither expected nor intended by the insured. The discharge was an inevitable by-product of the electroplating business. Melvin Rosenfeld was a chemical engineer. He must have known of the corrosive effect of acids, caustics and cyanides. But even if he was ignorant, he was put on notice repeatedly and frequently of what was happening. Nor in the light of *Newton v. Krasnigor*, 404 Mass. 682, 536 N.E.2d 1078, can it be maintained that defendants did not expect or intend the harm that resulted.

We hold, as a matter of law, that Travelers had no duty to defend the two actions brought against WIL.

We agree with the district court that there is no merit to defendants' claim that Travelers was estopped to deny coverage. Travelers acted fully within its rights in taking the course of action that it did. Nor did the district court err in finding that Travelers did not breach its duty to defend. *See Sterilite Corp. v. Continental Cas. Co.*, 458 N.E.2d at 343–44.

## V. DUTY TO INDEMNIFY

The duty to indemnify is narrower in scope and distinct from the duty to defend. *Sterilite Corp. v. Continental Cas. Co.*, 458 N.E.2d at 341, n. 4. The reason is that an insurer's obligation to defend is measured by the allegations of the underlying complaint while the duty to indemnify is determined by the facts, which are usually established at trial. *Newell–Blais Post No. 443 v. Shelby Mut. Ins.*, 396 Mass. 633, 487 N.E.2d 1371, 1374 (1986). Here, however, the cases were settled prior to trial. This means that the duty to indemnify must be determined in the basis of the settlement and, since this was a summary judgment proceeding, the undisputed facts.

■ We agree with and adopt fully that portion of the district court opinion holding that because the amount paid by the defendants in the Commonwealth suit was for "civil penalties" not "damages" the payment was not covered by the insurance policy's "damages" clause. Travelers was, therefore, as the district court held, under no duty to indemnify the defendants for all or any part of the $27,500 paid to the Commonwealth in settlement of its suit.

We now turn to the final insurance issue, whether defendants should be indemnified in full or in part for their settlement with First Republic. This requires that we dig into the sludge-in-the-crawl-space question. Sometime after suit was brought but prior to settlement, First Republic discovered that the crawl space beneath Buildings 18 and 19 contained contaminated sludge. Defendants assert that they were not responsible for the sludge getting there, but if they were, it was not expected or intended and its presence was an "occurrence" within the meaning of the policy. Rosenfeld testified that he had no knowledge of WIL dispositing sludge in the crawl space directly and that any minor accidental spills of chemical wastes on the floor were wiped up immediately. Part of the evidence is a lengthy affidavit by David P. Ostrye, an environmental chemist, who made an inspection of the premises formerly occupied by WIL. It was Ostrye's opinion that the sludge, or most of it, came from splits or openings in drainage pipes located in the crawl space under Building 19. He further averred that the splits in the pipes were the result of freezing. Ostrye's final conclusion was that: "wastewater sources other than that discharged by WIL into the sewer system served as contributing sources for the accumulation of sludge in the crawl space of Buildings 18 and 19." This evidence raised an issue of material fact as to how the sludge got into the crawl space. If the sludge entered the crawl space "as a concomitant of [WIL's] regular business activity," *Great Lakes*, 727 F.2d at 33, then the exclusion would apply; if it was an "occurrence" neither expected nor intended or came from a source other than WIL then the exclusion would not be operative. The district court did not resolve this disputed question, as it could not within the framework of a summary judgment dispo-

sition, but held that another exclusion in the policy, the leased property exemption, precluded coverage. We will discuss this *infra*.

At the outset of our analysis we note that First Republic's claim for damages does not mention sludge in the crawl space. The damages are specified as follows: "the brick work, steel structure, plaster, floor surfaces, doors, windows and sills and ceiling and piping and electric conduit therein have become pitted, corroded and partially destroyed."

Nor is there any mention of crawl space sludge in the settlement agreement or the agreement for judgment. It can be fairly inferred, however, that the expense of curing the sludge problem was a factor considered in the settlement. The record shows that the sludge was removed and the crawl space filled with concrete to prevent any further contamination to the soil and groundwater.

We next consider the leased property exemption. The policy states that it "does not apply to property damage to property owned or occupied or rented to the insured." The court noted that there was a dispute over whether the lease included the crawl space. It found "that the crawl space was land over which the defendant used or had exercised control." The court concluded: "I believe a fair reading of the entire record and the lease specifically permits a conclusion as a matter of law that the defendants rented this part of the building as well."

■ Defendants dispute the district court's finding and ruling, claiming that, at the least, this was a disputed issue of material fact. We agree. There is evidence in the record indicating that First Republic exercised dominion and control over the crawl space and that whatever use WIL made of the crawl space was only incidental to the installation and servicing of its equipment. Since the lease is not conclusive and there is a dispute of a material issue of fact as to whether defendant WIL used or exercised control over the crawl space, it was error for the district court to resolve this question by summary judgment.

Travelers argues that regardless of the leased premises exemption, it has no duty to indemnify. It contends that under its policy, it is only "legally obligated to pay as damages because of ... property damage to which this insurance applies." Therefore, it asserts that since defendants claim that they did not put the sludge in the crawl space, they were not legally obligated to pay First Republic anything for this and the policy does not apply.

This argument overlooks the fact that First Republic's claim for damages was specific and did not include a claim for damages due to sludge in the crawl space. It also fails to distinguish between the duty to defend and the duty to indemnify. In determining the duty to defend, "the process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." *Sterilite Corp. v. Continental Cas. Co.*, 458 N.E.2d at 341. But the duty to indemnify is determined by the facts. *Newell–Blais Post No. 443 v. Shelby Mut. Ins.*, 487 N.E.2d at 1374. One of the facts here is that there was sludge in the crawl space and presumably this was a factor in the settlement sum paid to First Republic. Whether or not the exclusion applies depends on how the sludge got into the crawl space. Since there is a dispute as to this, it can only be resolved by a trial.

## VI. THE STATE LAW CLAIM

We agree with the district court that defendants' claim under the Consumer Protection Act of Massachusetts, Mass.Gen. Laws Ann., ch. 93A and Mass.Gen.Laws ch. 176D, § 3, (9), is meritless. We adopt the district court's opinion on this issue.

## SUMMARY

1. Travelers had no duty to defend either law suit.

2. Travelers had no duty to indemnify defendants for the amount paid in settlement of the Commonwealth claim.

3. On remand the district court shall determine whether the leased property exemption applies to the crawl space. If it does not, the district court shall then determine whether the damage caused by the crawl space sludge falls within the policy exemption. If it does not, then Travelers has a duty to indemnify defendants for that portion of the settlement paid for rectifying the condition caused by the crawl space sludge.

4. The district court's judgment on the pendent state law claim is affirmed.

Affirmed in part, reversed in part. Remanded for further proceedings consistent herewith.

No costs to either party.