1-95-1869

FRUIT OF THE LOOM, INC., ) Appeal from the 
 ) Circuit Court of
 Plaintiff-Appellant, ) Cook County.
 )
 v. ) 
 ) 
THE TRAVELERS INDEMNITY COMPANY, )
and TRANSPORTATION INSURANCE )
COMPANY, ) Honorable
 ) Albert Green,
 Defendants-Appellees. ) Judge Presiding.


 PRESIDING JUSTICE HARTMAN delivered the opinion of the court: 
 This appeal concerns environmental pollution at a plant Fruit of the Loom,
Inc. (FOTL) formerly owned in Bridgeport, Connecticut. FOTL sought a declaratory
judgment against defendants Travelers Indemnity Company (Travelers) and
Transportation Insurance Company (Transportation) for failing to defend it in
connection with the subject pollution. Travelers and Transportation filed
answers and affirmative defenses. Travelers also filed a counterclaim seeking
a declaration that it had no duty to defend or indemnify FOTL.
 Following cross-motions for summary judgment between Travelers and FOTL,
the circuit court initially granted partial summary judgment for FOTL but, upon
motion for reconsideration, vacated its earlier order and granted partial summary
judgment for Travelers instead. Subsequently, the court granted summary judgment
for Transportation as well. FOTL appeals.
 The issues presented include whether (1) a "suit" was filed giving rise to
the insurers' duties to defend; (2) defendants are estopped from raising
noncoverage as a defense where the underlying action was settled before either
defendant filed a declaratory judgment action; (3) defendants' "intentional
damage" exclusions bar coverage; (4) FOTL breached its duty to notify; (5)
defendants' "pollution exclusions" bar coverage; and (6) FOTL waived its extra-
contractual claims by not raising them on appeal. We need address only issue
one, under point I of this opinion, and issue five, under point II of this
opinion, for disposition of this appeal.
 From the mid-1950s to the late 1970s FOTL, through a former subsidiary,
Universal Manufacturing Corporation (Universal), operated a leased facility in
Bridgeport (Bridgeport plant) to manufacture electrical capacitors. Universal
used low-chlorinated liquid polychlorinated biphenyls (PCBs) to impregnate the
capacitors. One such agent, Aroclor 1242, was used until approximately 1972;
another, Aroclor 1016, was used until 1978. PCBs, dielectric compounds that
increase the efficiency of capacitors, are essentially insoluble in water. The
Bridgeport plant initially used 55 gallons of PCBs each week to impregnate its
capacitors, which rose to approximately 2,000 gallons per week prior to its
discontinued use of PCBs in February 1978.
 Universal purchased the PCBs from Monsanto Company (Monsanto) which, as
early as 1963, placed warning labels on its Aroclor products concerning toxicity,
and distributed product bulletins informing customers of toxicity and safe
handling of the product. In the late 1960s, Monsanto discovered PCBs' harmful
effects on the environment of which it informed Universal in March 1969. 
Monsanto specifically advised Universal to keep all chemicals well contained and,
subsequently, to exercise the highest degree of control in its storage of PCB
products. In May of 1970, Monsanto began to label Aroclor 1242 with a caution
stating "[e]xtreme care should be taken to prevent any entry into the environment
through spills, leakage, use, disposal, vaporization or otherwise." Aroclor 1016
was similarly labeled. Monsanto's warnings about the dangers of PCBs also were
placed on its shipping documents and invoices. In February of 1970, however,
Monsanto notified Universal that low-chlorinated PCBs (less than 54%) "have not
been found in the environment and appear to present no potential problem to the
environment." Aroclor 1016 contained 42% chlorine. In July of 1971, Monsanto
sent a product bulletin to Universal, urging that "every care should be taken by
users of PCB-containing products to prevent entry into the environment ***." The
bulletin proposed nine guidelines for users of PCBs to follow.
 The Bridgeport plant used large amounts of lower-chlorinated PCBs to
impregnate the capacitors, about one million pounds each year. Some of these
PCBs escaped from the capacitor impregnation room through the wood and steel
flooring, down into the underlying oil reclamation room where it leached into the
concrete slab beneath the plant and leached through the concrete into the soil
and groundwater beneath the oil reclamation room. The "source point" for this
contamination was the capacitor impregnation area at the Bridgeport plant. It
was an ongoing process. 
 A Universal foreman, Robert Delvy, testified that PCB drippage occurred all
the time; it was an ongoing problem to keep certain areas clean. He later
testified that the drippage occurred occasionally and that the drippage was
always cleaned up because "it was slippery and somebody could fall." Universal
used chipboard to absorb the oil and "spent tons of money trying to keep the
floor in reasonably good condition." Some drippage soaked through a protective
floor to the underlying wood floor and into the basement area. Delvy stated that
during the early 1980s, Universal made several efforts to clean up the PCB
contamination and that material from years before was contaminated, including
wood, walls and floors. 
 Universal had stored PCB drums in its plant parking lot at one time; it
excavated most of the parking lot in an effort to clean up PCB contamination. 
In the past, Universal poured PCBs into the sewer drains. Delvy "pumped probably
3 or 400 gallons right out an exhaust port of a vacuum pump out onto the driveway
and down the street and [it] ran into sewer drains and [it] ran into the railroad
viaducts on more than one occasion." Delvy poured PCBs into the external drains
in the plant; he and "other people" did this as a practice for a time when he was
young until he was stopped. In the 1960s, the practice of pouring PCBs into the
sewer was discontinued. Delvy did not know whether the drippage of PCBs was
causing property damage. 
 Despite Universal's precautionary measures, pipe leaks and overflows
continually occurred in the impregnation area, for example, when "somebody forgot
to put a clamp on a chamber door" or when a "bottom clamp was left open." When
significant spills occurred, the employees used "speedy dry"; when lesser amounts
spilled on the floor, the chipboard was "put there to soak it up." Employees
often got PCB oil on their shoes and tracked the oil throughout the plant, which 
was "not specifically" cleaned up. 
 Although one Monsanto employee reported that the Bridgeport plant was very
clean, other Monsanto employees were concerned about the spillage at the plant. 
A Monsanto report indicated that Universal was losing about "6« lbs. per week out
of vent lines." The report concluded that Universal was losing approximately one
"tank car of Aroclor per year." 
 The Bridgeport plant was inspected several times prior to 1986. In 1976,
the Connecticut Department of Environmental Protection (DEP) and the Federal
Environmental Protection Agency (EPA) inspected the Bridgeport plant. They
issued an abatement order which stated that Universal is "maintaining a condition
which reasonably can be expected to create a source of pollution to the waters
of the state ***." The order did not allege any contamination of the building,
soil or groundwater, but ordered Universal to investigate all sources of PCBs
associated with the manufacturing of capacitors and to institute any necessary
procedures or modifications to ensure no contamination by PCBs. Universal was
required to submit a report detailing the use and disposal of PCBs.
 A 1981 EPA inspection report cited Universal for several violations
including improper disposal and storage of PCBs and labeling and recordkeeping
of PCB containers. 
 On November 17, 1982, DEP inspected the Bridgeport plant in order to verify
the findings by EPA one year earlier. In its report, DEP noted a "4' x 15' spill
next to the flood tank," as well as "numerous spills throughout the processing
section of the facility." DEP sampled the spills to determine the presence of
PCB. The report noted the "spillage might be DOP," a non-PCB fluid. DEP also
cited Universal for failing to keep proper dating and recordkeeping of PCBs. The
report also noted another extensive spill of waste oil but indicated that the oil
was DOP. 
 On February 1, 1983, DEP conducted another inspection of the facility. In
August of 1983, EPA sent Universal a notice of noncompliance, relating to the
1982 and 1983 inspections. The notice of noncompliance stated that Universal had
improperly stored PCB "drums in the basement of your facility where the masonry
walls had small cracks and the floor had an opening which may permit spilled PCB
fluid to flow from the storage area." DEP's report of 1982 noted that it
concurred in the findings concerning the basement area but the inspectors were
unable to find an "opening" noted in the 1981 report.
 In 1986, FOTL sold Universal and its interest in the Bridgeport plant to
MagneTek. A Connecticut statute known as the "Transfer Act" required a seller
of corporate realty to certify to both DEP and the buyer that either (1) there
is no contamination on site, or (2) one of the parties to the sale agrees to be
responsible for any clean up of the site. On January 29, 1986, FOTL certified
to DEP that FOTL would remain responsible for the economic consequences of any
remedial action. The certification stated that the Bridgeport plant "utilized
PCB until 1978" and that, despite "prior cleanup efforts, residual PCB
contamination from pre-1978 activities has recently been discovered." FOTL also
certified that it would remove any hazardous waste at the Bridgeport plant "in
accordance with procedures and a time schedule approved by the Commissioner of
Environmental Protection pursuant to an order, stipulated judgment, or consent
agreement." 
 In the spring of 1986, Universal retained Memphis Environmental Center
(Memphis) as environmental manager at its Bridgeport plant. Memphis became
responsible for managing all issues concerning PCB contamination. Memphis
advised DEP of remedial plans at the Bridgeport plant in the summer of 1986,
which remedial measures were implemented in order to "minimize employee exposure
to surface and airborne PCB contamination." On November 19, 1986, FOTL submitted
a report to DEP "summarizing the results of in-plant and soil and groundwater
data collection, and recommend[ed] a phased approach to remediation at
Universal." 
 On September 4, 1986, DEP conducted an inspection, pursuant to FOTL's
certification of transfer, and discovered PCB contamination at the Bridgeport
plant. The inspection, according to a later 1986 DEP letter to Universal from
Scott Deshefy, DEP's PCB coordinator, a PCB investigation "was conducted as an
extension of an investigation, voluntarily initiated by Universal Manufacturing
Corporation, to determine the extent of PCB contamination resulting from past
manufacturing of small, low-voltage capacitors impregnated with PCBs." 
 FOTL's Director of Insurance, Burgess D. Ridge, received a copy of the 1986
DEP letter on March 17, 1987. Ridge concluded that there was a claim under the
terms of its insurance policies, and reported the letter to Travelers and
Transportation on March 19, 1987. Ridge did not believe that Farley, Universal's
parent, was entitled to a defense from the insurers until "it was established
that there was a property damage claim that required defense." Ridge did not
think that a property damage claim existed in the fall of 1985. 
 On April 22, 1987, Travelers acknowledged receipt of Ridge's letter of
March 19, 1987, notifying Travelers of DEP's letter. On July 2, 1987, Travelers
sent Ridge a questionnaire in order to determine whether the insurance policies
issued afforded coverage. The Travelers' letter noted, among other things: 
 "Please be advised that Comprehensive General Liability
 insurance responds to liability arising out of an
 "occurrence" resulting in "bodily injury" or "property
 damage" during the policy periods. This type of policy
 may also contain language excluding coverage for damages
 arising out of any emission *** of any liquid *** or
 pollutant that is either expected or intended from the
 standpoint of the insured ***." 
 Both Travelers' letters reserved all rights and provided that neither the
acknowledgement nor any investigation "shall be construed as a waiver of any of
the rights and defenses available to The Travelers ***." 
 On June 21, 1988, FOTL negotiated a consent order with DEP, requiring FOTL
to (1) continue investigating PCB contamination resulting from past manufacturing
practices of Universal; (2) minimize any threat to human health and/or the
environment; and (3) obtain discharge permits as necessary for any "discharge to
the waters of the State resulting from implementation of remedial measures." The
consent order established a three phase schedule for remediation of the site and
concluded that failure to comply subjects FOTL "to penalties under Section 22a-
438, 22a-469, and injunction under Section 22a-435 of the Connecticut General
Statutes." 
 A soil removal component report prepared for Universal in 1993 stated that
"5,432 tons of contaminated materials were removed from the Site as a result of
completing the soil removal component of the final phase of remediation at the
Site. It is estimated that approximately 17,000 kilograms (or 37,478 pounds) of
PCBs were removed from these materials." 
 FOTL's predecessors in interest purchased primary comprehensive general
liability insurance policies from Travelers from January 1, 1965, to October 31,
1978, and from Transportation from November 1, 1978, to January 1, 1986.
 The Travelers' policies from 1965 to September 30, 1971, did not contain
a pollution exclusion provision. The Travelers' policies from October 1, 1971,
to October 31, 1978, excluded coverage under the following circumstances: 
 (a) if such emission, discharge, seepage,
 release or escape is either expected or
 intended from the standpoint of any insured
 or any person or organization for whose
 acts or omissions any insured is liable, or
 (b) resulting from or contributed to by any
 condition in violation of or non-compliance
 with any governmental rule, regulation or
 law applicable thereto ***." 
 The Travelers' policies from January 1, 1965, to September 30, 1973,
contain the following "intentional damage" exclusion:
 "Exclusions. Part I of this agreement does not
 apply:
 ***
 (d) to bodily injury, injury arising out of
 discrimination, advertising injury or property
 damage caused intentionally by or at the
 direction of the Insured unless committed for the
 purpose of protecting persons or property ***." 
 The Travelers' policies issued after 1973 amended the above "intentional damage"
exclusion to create the following "expected or intended" exclusion:
 "Exclusions. Part I of this agreement does not
 apply:
 ***
 (d) to bodily injury, injury arising out of
 discrimination, advertising injury or property
 damage which was either expected or intended from
 the standpoint of the insured ***." 
 Transportation's policies contain the following pollution exclusion
provisions:
 "Exclusions. Part I of this policy does not apply:
 ***
 (i) to bodily injury or property damage arising out
 of the discharge, dispersal, release or escape of
 smoke, vapors, soot, fumes, acids, alkalis, toxic
 chemicals, liquids or gases, waste materials or
 other irritants, contaminants or pollutants into
 or upon land, the atmosphere or any water course
 or body of water, but this exclusion does not
 apply if such discharge, dispersal, release or
 escape is sudden and accidental." 
 FOTL initially filed a complaint for a judicial declaration that
Transportation and Travelers were liable for all costs incurred in connection
with pollution conditions at the Bridgeport plant. FOTL's complaint also
contained counts for breach of the covenant of good faith, violation of the
Illinois Consumer Fraud and Deceptive Business Practices Act, and violation of
the Illinois Insurance Code. Thereafter, FOTL filed an amended complaint, to
which Travelers and Transportation filed answers and asserted affirmative
defenses. Travelers also filed a counterclaim against FOTL, seeking a
declaration that Travelers did not have a duty to defend or indemnify FOTL. FOTL
subsequently filed a motion for partial summary judgment on the duty to defend
against Travelers and sought to bar Travelers from asserting several affirmative
defenses. 
 On January 11, 1993, the circuit court granted FOTL's motion for partial
summary judgment against Travelers for breaching its duty to defend. FOTL moved
again for a partial summary judgment against Travelers, seeking to bar Travelers
from asserting any remaining defenses. Travelers moved the court to reconsider
its January 11, 1993, ruling estopping Travelers from asserting certain defenses,
relying upon Sears, Roebuck & Co. v. Seneca Insurance Co., 254 Ill. App. 3d 686,
627 N.E.2d 173 (1993). Travelers also cross-moved for summary judgment based upon
its "pollution exclusion" defense. On June 6, 1994, the circuit court granted
Travelers motion to reconsider, vacated its earlier order and granted Travelers'
cross-motion for partial summary judgment.
 FOTL thereafter moved the circuit court to certify two questions for
interlocutory appeal. Travelers again moved for summary judgment, seeking
dismissal of FOTL's entire action based upon its "expected or intended" and late
notice defenses. Transportation also moved for summary judgment based upon its
"pollution exclusion." FOTL cross-moved against both defendants. Following a
hearing, the circuit court granted Travelers' and Transportation's motions for
summary judgment and denied all plaintiff's motions. This appeal followed.
 I
 FOTL initially argues the circuit court erred in ruling as a matter of law
that defendants have no duty to defend. Travelers and Transportation maintain
that Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co., 166 Ill. 2d
520, 655 N.E.2d 842 (1995) (Lapham-Hickey), governs the disposition of this case.
 A
 A motion for summary judgment will be granted only when the pleadings,
depositions, admissions, and affidavits on file, if any, show that there is no
genuine issue of material fact and that the moving party is entitled to judgment
as a matter of law. 735 ILCS 5/2-1005 (West 1994). A court may draw inferences
from undisputed facts but will not grant summary judgment unless those facts are
susceptible of only a single inference. Bellerive v. Hilton Hotels Corp., 245
Ill. App. 3d 933, 935-36, 615 N.E.2d 858 (1993). This court reviews summary
judgment orders de novo; accordingly, we examine all the evidentiary material on
file at the time of the entry of the orders appealed from in the light most
favorable to the non-movant. Trevino v. Flash Cab Co., 272 Ill. App. 3d 1022,
1025, 651 N.E.2d 723 (1995).
 Insurance contracts are subject to the same rules of construction as other
types of contracts. Dunlap v. Illinois Founders Insurance Co., 250 Ill. App. 3d
563, 568, 621 N.E.2d 102 (1993). In construing a contract, the primary objective
is to effectuate the intent of the parties. Dunlap, 250 Ill. App. 3d at 568. 
"Intent may be ascertained from the circumstances surrounding the issuance of the
policy, including the situation of the parties and the purpose for which the
policy was obtained." Dash Messenger Service, Inc. v. Hartford Insurance Co.,
221 Ill. App. 3d 1007, 1010, 582 N.E.2d 1257 (1991). 
 An insurer may not justifiably refuse to defend an action against its
insured unless it is clear from the face of the underlying complaint that the
allegations fail to state facts which bring the case within, or potentially
within, the policy's coverage. Conway v. Country Casualty Insurance Co., 92 Ill.
2d 388, 393, 442 N.E.2d 245 (1982). The duty to defend arises even if only one
of the theories of recovery is within the potential coverage of the policy. 
Shell Oil Co. v. AC&S, Inc., 271 Ill. App. 3d 898, 904, 649 N.E.2d 946 (1995).
 In Lapham-Hickey, the supreme court determined "when a 'suit' exists in an
environmental context ***." 166 Ill. 2d at 530. The Lapham-Hickey court noted
that "the word 'suit' refers to a proceeding in a court of law [citations]" and
observed, in part, as follows:
 "The definition of the word 'suit' as requiring an
 action in a court of law is further supported by
 analyzing the connection between the filing of a
 complaint and the duty to defend. Whether an insurer's
 duty to defend has arisen is determined by looking to
 the allegations in the underlying complaint and
 comparing these allegations to the policy provisions. 
 [Citation.] If the facts alleged in the underlying
 complaint fall within or even potentially within policy
 coverage, the insurer has a duty to defend its insured
 against the complaint. [Citation.] Thus, the duty to
 defend extends only to suits and not to allegations,
 accusations or claims which have not been embodied
 within the context of a complaint. In the instant case,
 a complaint alleging liability for property damage has
 never been filed against Lapham-Hickey. Without a
 complaint, there is no 'suit.' And without a 'suit,'
 *** [insurer's] duty to defend Lapham-Hickey is not
 triggered.
 ***
 Neither the initial letter from the EPA, the draft
 consent order nor the 'no-action' letter initiated a
 suit. None were filed in a court of law and none
 accomplished service of process upon Lapham-Hickey. 
 Rather, the draft consent order and ultimately the 'no-
 action' letter were mechanisms used to encourage Lapham-
 Hickey to voluntarily investigate the contamination at
 the facility. Though the tone of these documents may
 have been confrontational, these documents by themselves
 are not complaints and do not impose liability." 166
 Ill. 2d at 532-33.
 In the case sub judice, defendants' duties to defend similarly apply to
"suits" under the explicit language of both policies, "to defend any suit
alleging such injury or damage" (Travelers' policy, Coverage A, Part I(a);
Transportation's policy, Coverage A, Part I(a)). DEP never filed a complaint in
court against FOTL or any of its subsidiaries. The only substantive difference
between the present case and Lapham-Hickey is that DEP's letter expressly stated
that it was an enforcement action whereas no enforcement action was initiated in
Lapham-Hickey. 166 Ill. 2d at 525. In the instant case, however, Memphis
notified FOTL's and Farley's attorneys that DEP's inspector did "not favor a
Consent Order but preferred a letter from the State to the company indicating a
Notice of Violation allowing a timetable for coming into compliance." Memphis'
letter also indicated that the inspection which eventually brought about the
letter was initiated by Universal itself. Further, DEP's letter describes itself
as a "notice *** issued to formally require affirmation that the aforementioned
PCB environmental contamination is completely and expedi[ti]ously removed and
disposed in accordance with State and Federal PCB regulations." DEP's letter
also stated that it was a "memorandum" and that Universal "should submit a
written certified statement specifically describing the remedial actions to be
taken ***." 
 As in Lapham-Hickey, DEP's letter did not initiate a suit, was not filed
in a court of law and did not accomplish service of process upon Universal. 
DEP's letter, by its very terms, attempted only to encourage Universal to
undertake remedial action. Lapham-Hickey, therefore, clearly controls the
disposition of this issue. 
 DEP's letter did not initiate a suit and, therefore, did not trigger
defendants' duties to defend.
 B
 FOTL contends that Lapham-Hickey should not be applied retroactively. In
Forest Preserve District v. Pacific Indemnity Co., 279 Ill. App. 3d 728, 734, 665
N.E.2d 305 (1996), the court noted that Lapham-Hickey had retroactive application
because the supreme court's opinion in Lapham-Hickey did not state that it was
prospective and the "opinion on its face applies to the litigants in the Lapham-
Hickey case ***." It must be concluded that Lapham-Hickey is to be given
retroactive application.
 C
 FOTL asserts, however, the circuit court's initial ruling of January 11,
1993, that a "suit" was commenced, has become the law of the case because neither
insurer appealed. 
 A decision on a question of law from which no appeal has been taken becomes
the law of the case. Wolfe v. Industrial Comm'n, 138 Ill. App. 3d 680, 686, 486
N.E.2d 280 (1985). Contrariwise, a party cannot complain of an error which does
not prejudicially affect it and one who has obtained by judgment all that has
been asked in the circuit court cannot appeal from that judgment. Material
Service Corp. v. Department of Revenue, 98 Ill. 2d 382, 386, 457 N.E.2d 9 (1983). 
It is the judgment and not what else may have been said by the circuit court that
is on appeal. Material Service Corp., 98 Ill. 2d at 387. A reviewing court is
not bound to accept the reasons given by a circuit court for its judgment, which
may be sustained upon any ground warranted, regardless of whether the circuit
court relied upon such ground and regardless of whether the reason given by the
circuit court was correct. Material Service Corp., 98 Ill. 2d at 387.
 Defendants here correctly observe that they did not need to appeal the
lower court's judgment because no part of it was adverse to them. FOTL counters
that Travelers did not receive attorneys' fees and, therefore, an aspect of the
judgment was not in appellee's favor. Travelers asserts that this court can
affirm the circuit court's order on any ground.
 The cases relied upon by FOTL (e.g., Wolfe v. Industrial Comm'n, 138 Ill.
App. 3d 680, 686, 486 N.E.2d 280 (1985), City of Chicago v. Industrial Comm'n,
59 Ill. 2d 284, 290, 319 N.E.2d 749 (1974), and City of Wilmington v. Industrial
Comm'n, 52 Ill. 2d 587, 289 N.E.2d 418 (1972)), involve instances where the party
prevailing in the circuit court did not file a cross-appeal but nevertheless
requested the reviewing court to reverse a part of the judgment. In the present
case, Travelers does not seek to reverse any part of the circuit court's
judgment. Travelers' counterclaim against FOTL requested attorneys' fees and
costs. The circuit court granted Travelers and Transportation costs in its final
order. No mention was made of attorneys' fees in either the final order or the
court's last proceeding. Unlike the cases relied upon by FOTL, Travelers seeks
only to affirm the circuit court's ruling. True, the circuit court, during the
course of its January 1993 proceedings, found that a "suit" had been filed;
however, the January 1993 order was subsequently vacated. Although FOTL
accurately notes the circuit court retained its reasoning, that a suit had been
filed in subsequent proceedings, nevertheless summary judgment was granted for
Travelers and, therefore, there was no reason for Travelers to file a cross-
appeal.
 This court can sustain the circuit court's judgment upon any ground
warranted, regardless of whether the circuit court relied upon such ground and
regardless of whether the reason given by the circuit court was correct. 
Material Service Corp., 98 Ill. 2d at 387. In any event, the decision in Lapham-
Hickey controls the disposition of whether a "suit" was commenced by DEP's
letter. 
 In sum, the issue of whether a "suit" had been filed did not become the law
of the case because defendants did not have to file a cross-appeal where they do
not seek to reverse any part of the circuit court's judgment. 
 II
 FOTL contends that defendants' pollution exclusions do not operate to bar
coverage.
 A
 FOTL initially argues that Transportation's pollution exclusion does not
apply because FOTL did not "expect or intend" any discharge of PCBs into the
external environment.
 In Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90,
120-25, 607 N.E.2d 1204 (1992) (OMC), the supreme court discussed the identical
pollution exclusion contained in Transportation's policies in the present case. 
The OMC court determined that the "sudden and accidental" language of the
exclusion retriggers "coverage for unexpected or unintended releases" and
discharges of pollutants. 154 Ill. 2d at 123-24. The OMC court observed that
the relevant consideration "is whether the insured expected and intended to
discharge the particular toxic[ant] it is alleged to have discharged and for
which it now seeks coverage." (Emphasis in original.) In other words, if FOTL
expected the release of PCBs into the environment, the pollution exclusion
applies and the loss is not covered.
 In the present case, the record demonstrates that FOTL regularly expected
spills during the manufacturing process. In order to clean up the continually
recurring spills and drippage, FOTL used "speedy dry," rags, mops and chipboard
to absorb the oil. A study of the plant revealed "surface contamination" of the
impregnation chamber, the basement beneath the chamber, the fluid transfer area,
and "possibly the load testing area." Additionally, the "wood floors and
timbers" beneath the impregnation chamber are "likely saturated with PCBs." The
concrete floor in the basement similarly received "significant spillage, and is
likely to be contaminated to a considerable depth with PCBs." This evidence
sufficiently demonstrates that FOTL regularly experienced and endeavored to deal
with discharges and releases of the PCBs. To claim that such discharges and
releases were unexpected is disingenuous. 
 FOTL insists that because there is also evidence of accidental spills, they
were "unexpected" and the policies do not bar coverage. Spills which occurred
when "somebody forgot [accidently] to put a clamp on a chamber door" or when "a
bottom clamp [accidently] was left open," were ordinary and recurring parts of
the business, which also must be deemed to have been expected by FOTL in its
operations. Compare Lumbermens Mutual Casualty Co. v. Belleville Industries,
Inc., 938 F.2d 1423, 1429 (1st Cir. 1991) (rejecting insured's contention that
some pollution was due to accidents because a company that "purposefully and
regularly [has] been carrying on operations involving continual pollution" is not
entitled to policy coverage) with Nashua Corp. v. First State Insurance Co., 648
N.E.2d 1272, 1276 (Mass. 1995) (remanding for a determination of what portion of
"pollution damage resulted from" ordinary operations (excluded), and what portion
was caused by sudden and accidental releases (covered)). Despite evidence here
of slight accidental spills, FOTL nevertheless is shown to have expected such
accidents in the ordinary course of business and, therefore, remand is not
necessary. Transportation's pollution exclusion bars coverage in the present
case.
 B
 FOTL next contends that Travelers' pollution exclusion does not apply. 
Travelers asserts that it has no duty to defend or indemnify plaintiff because
the pollution exclusion bars coverage for the illegal contamination as well as
for the expected and intended discharges of PCBs.
 Travelers' policies contain a pollution exclusion which bars coverage for
property damage arising out of any discharge of any liquid if such discharge
results from "any condition in violation of or non-compliance with any
governmental rule, regulation or law applicable thereto ***." Travelers'
exclusion bars coverage, then, for any contamination which results from any
condition in violation of any governmental law. The DEP's notice of violation
stated that Universal violated several Connecticut statutes through its "illegal
disposal of PCBs."
 FOTL relies upon Travelers Indemnity Co. v. Dingwell, 414 A.2d 220 (Me.
1980), to establish that the pollution exclusion requires that the illegal
conduct must cause the discharge. Dingwell is distinguishable because the
complaint there did not "allege that *** [insured's] operation has ever been
found to violate any state statute or regulation ***." 414 A.2d at 228. In
Dingwell, it appeared from the complaint that insured's "operation conformed to
the existing law." 414 A.2d at 228. In the present case, DEP's letter plainly
states that Universal violated state statutes. Although FOTL contends that
"disposal" means "accidentally to discard" and that FOTL had to intend to
discharge pollutants, Travelers' policy merely requires a violation of state
statute or regulation. See Travelers Insurance Co. v. Waltham Industrial
Laboratories Corp., 722 F. Supp. 814, 828 n.6 (D.Mass. 1988), aff'd in relevant
part, 883 F.2d 1092 (1st Cir. 1989). We conclude that Travelers' pollution
exclusion expressly bars coverage for the contamination in the present case.
 C
 FOTL next argues that Travelers' pollution exclusion does not apply because
FOTL did not expect or intend to discharge pollutants. As previously discussed
in Section A of this Part, evidence sufficiently demonstrated that FOTL expected
discharges and releases of the PCBs.
 The pollution exclusion merely requires an expectation of release or escape
of pollutants. Although FOTL also focuses on its stringent housekeeping, the
evidence sufficiently shows that spills occurred commonly during the ordinary
course of business. As a result, Travelers' pollution exclusion bars coverage
in the present case.
 D
 Travelers asserts that since it has no duty to defend under the pollution
exclusion provisions of its policies, it has no duty to indemnify because an
insurer's duty to indemnify is narrower than its duty to defend. FOTL maintains
the duty to indemnify is separate from the duty to defend.
 In cases where no duty to defend exists, there is no duty to indemnify
since the duty to defend is broader than the duty to indemnify. Crum & Forster
Managers Corp. v. Resolution Trust Corp., 156 Ill. 2d 384, 398, 620 N.E.2d 1073
(1993). Because we conclude that Travelers has no duty to defend FOTL,
concomitantly it has no duty to indemnify FOTL. 
 For the reasons set forth in this opinion, we affirm the decision of the
circuit court granting summary judgment in favor of Travelers Indemnity Company
and Transportation Insurance Company.
 Affirmed.
 SCARIANO and DiVITO, JJ., concur.